DMB:JPL/BWB
F.#2010R00057

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          10-CR-19 (S-4)(RJD)

    - against -

ADIS MEDUNJANIN,
    also known as "Muhammad,"

        Defendant.

- - - - - - - - - - - - - - X

## **MEMORANDUM IN SUPPORT OF MOTION FOR ANONYMOUS JURY**

LORETTA E. LYNCH
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

David Bitkower
James P. Loonam
Berit W. Berger
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially-sequestered jury.  Specifically, the government requests that the names, addresses and workplaces of members of both the venire and petit juries not be revealed, that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Anonymous juries subject to these additional precautions have been used in numerous terrorism cases, including recent cases in the Eastern District of New York.  See, e.g., United States v. Stewart, 590 F.3d 93, 124 (2d Cir. 2009) (prosecution for providing support to Sheikh Omar Abdel Rahman); United States v. Betim Kaziu, 09 CR 660 (JG) (prosecution for plot to join terrorist group and target American servicemen overseas); United States v. Russell Defreitas et al., 07 CR 543 (DLI), 2011 WL 317964, *3 (E.D.N.Y. Jan. 31, 2011) (prosecution for plot to detonate fuel tanks at John F. Kennedy airport); United States v. Al-Moayad, 03 CR 1322 (SJ) (prosecution for providing material support to al-Qaeda and Hamas); see also United States v. Sarachandran et al., 06 CR 615 (RJD) (anonymous jury ordered in prosecution for providing support to the Tamil Tigers, but defendants pleaded guilty before trial).

1

Even by comparison with the terrorism cases cited above, this case presents extraordinarily compelling facts in support of an anonymous jury.  As discussed further below, this case involves allegations that the defendant conspired to kill American servicemen abroad, pledged his support to senior al-Qaeda leaders, returned to New York City to conduct a "martyrdom" attack against the civilian population here, and actually attempted to kill himself and others on behalf of al-Qaeda when he believed that authorities were close to arresting him.  Given the nature of the allegations, the involvement of al-Qaeda, a foreign terrorist organization with global reach and a history of targeting civilians in New York City, and the virtual certainty of substantial media and public attention, a fair trial requires empaneling an anonymous jury and the other requested protective measures.

I.  Factual Background

The defendant is charged by superseding indictment with (1) conspiracy to use weapons of mass destruction against persons or property in the United States, in violation of 18 U.S.C. § 2332a(a)(2); (2) conspiracy to commit murder abroad, in violation of 18 U.S.C. § 956(a)(1); (3) providing material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (4) conspiring to provide material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (5) receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D; (6) conspiring to

2

commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a); (7) attempting to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a); and (8) and (9) two counts of possessing a destructive device in furtherance of crimes of violence, in violation of 18 U.S.C. § 924(c).

A.    <u>The Plot To Attack the United States</u>

The government expects to establish the following facts at trial:  The defendant is a United States citizen who resided in Queens, New York.  On August 28, 2008, the defendant traveled with Najibullah Zazi and Zarein Ahmedzay to Pakistan with the goal of joining the Taliban and fighting violent jihad against United States and Coalition troops in Afghanistan.  The three men agreed on a cover story that Zazi and Ahmedzay were planning to visit their families in Pakistan and Afghanistan, while the defendant was traveling to Pakistan to meet and marry a local woman.  While in Pakistan, the men were initially unable to travel to Afghanistan to join the Taliban, and were instead recruited by and received military training from members of al-Qaeda.  In advance of their training, they each chose a <u>kunya</u>, or alias, for their mission: the defendant chose the name "Muhammad," Zazi chose the name "Salahuddin," and Ahmedzay chose the name "Omar."  After discussions with high-ranking al-Qaeda personnel, the defendant, Zazi and Ahmedzay agreed that they would not stay to fight in Afghanistan, but would instead return

3

to the United States to conduct a suicide attack.  Because the
defendant had a shorter-term Pakistani visa, the three men agreed
that he would return to the United States immediately.  Zazi and
Ahmedzay remained in Pakistan and Zazi received additional
training from al-Qaeda on how to construct improvised explosive
devices.

On September 25, 2008, the defendant returned to the
United States; Zazi and Ahmedzay returned separately in January
2009.  Shortly after returning to the United States, Zazi moved
to Colorado, while the defendant and Ahmedzay remained in New
York.  In approximately summer 2009, the three men met in New
York City and agreed to conduct a coordinated suicide bombing
attack against the New York City subway system during the
upcoming holiday of Ramadan, or approximately September 2009.

In late August 2009, Zazi reinitiated communication
with the group's al-Qaeda contact, a facilitator who went by the
name "Ahmad."  On September 6, 2009, Ahmad sent an email to Zazi.
In the message, Ahmad asked Zazi how he could contact "MUhammad"
[sic], which as noted above was the defendant's kunya.  On
September 6 and 7, 2009, Zazi wrote back to inform Ahmad, in
coded terms they had previously discussed in Pakistan, that the
suicide operation was ready to proceed, and to seek the precise
instructions for constructing one of the explosives Zazi had been
taught to make during his training in Pakistan.  Zazi had already

constructed a sufficient quantity of detonator explosive to assemble multiple improvised explosive devices for the attack.

On September 8, 2009, Zazi began driving to New York City with the detonator and other supplies necessary to build the explosive devices for the attack.  Zazi arrived in New York on the afternoon of September 10, 2009.  Although the precise timing of the attacks had not been worked out, the group's ultimate goal was for Zazi, Ahmedzay and the defendant to detonate the bombs during suicide attacks in the New York City subway system on Monday, Tuesday or Wednesday, September 14 through 16, 2009.  The plan was aborted after Zazi and Ahmedzay grew suspicious that they were being watched by law enforcement.  Zazi returned to Colorado on September 12, 2009, and was arrested there on September 19, 2009.

    B.   <u>The Defendant's Attempt to Kill Himself and Others</u>

On January 7, 2010, agents entered the defendant's apartment to execute a search warrant for the defendant's United States and Bosnian passports.  Upon reading the warrant, the defendant inquired about the listed violations of federal law, which were Title 18, United States Code, Sections 2332a(a)(2), which prohibits conspiracy to use weapons of mass destruction, and 2339D, which prohibits the receipt of military-type training from a foreign terrorist organization.  After the agents left,

the defendant told his attorney that he had looked up the
statutes on the internet, and found that the charges included
homicide.

The defendant then left his apartment and drove to the
Whitestone Expressway.   JTTF agents conducting surveillance
observed the defendant driving over 90 miles per hour.   The
defendant then called 911 from his car, and yelled at the 911
operator:

> This is Adis.  We love-  We love death [U/I]
> you love your life.  <u>There is no God but God
> and Muhammad is his messenger</u>.  <u>There is no
> God but God and Muhammad is his messenger</u>.[1]

While the defendant screamed in Arabic, the sound of his car
accelerating was audible in the background.   The defendant then
suddenly turned and collided with another vehicle on the
Expressway.   As the defendant later admitted to the agents, his
goal was to create an explosion by crashing his car that would
kill himself and others.   The defendant was subsequently taken
into custody and charged with the offenses listed above.

II.  <u>Applicable Law</u>

The Second Circuit has repeatedly upheld the use of
anonymous juries where there is reason to believe that the jury
needs protection, and reasonable precautions have been taken to
minimize any adverse effect on the jurors' opinion of the
defendant.   See <u>Stewart</u>, 590 F.3d at 124; <u>United States v.</u>

---

[1]  The underlined portion has been translated from Arabic.

6

Quinones, 511 F.3d 289, 296-97 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

As the Second Circuit explained in Stewart, "[a]s a general rule, a district court may order the empaneling of an anonymous jury upon (a) concluding that there is a strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." Stewart, 590 F.3d at 124 (quoting Paccione, 949 F.2d at 1192) (internal quotation marks omitted)). "[T]he use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and non-prejudicial reason for not disclosing their identities." Id. (quoting Aulicino, 44 F.3d at 1116) (internal quotation marks omitted). The decision to utilize an anonymous jury is thus "left to the district court's discretion." Paccione, 949 F.2d at 1192.

7

The Second Circuit has identified three predominant factors to consider in determining whether an anonymous jury is appropriate: (1) the seriousness of the charges against the defendant; (2) the potential threat of corruption of the judicial process; and (3) the expectation of potential publicity.  See Quinones, 511 F.3d at 295-96; Gotti, 459 F.3d at 346; Aulicino, 44 F.3d at 1116; Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192-93; Tutino, 883 F.2d at 1132; Barnes, 604 F.2d at 141. Where those factors counsel juror anonymity, the Circuit has also required that appropriate voir dire be permitted to avoid any undue prejudice to the defendant.  See, e.g., Stewart, 590 F.3d at 124-25; Quinones, 511 F.3d at 297.

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities."  604 F.2d at 141.  The Barnes court specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be
> subjected to violence or death at the hands of a
> defendant or his friends, how can his judgment be
> as free and impartial as the Constitution requires?
> If 'the anonymous juror feels less pressure' as a
> result of anonymity, . . . this is as it should be
> — a factor contributing to his impartiality.

8

Id. at 140-41.  Similarly, in Thomas, 757 F.2d at 1364, the
Second Circuit articulated the importance of using jury anonymity
as a mechanism to ensure a jury's fair and impartial verdict free
from fear or intimidation:

> As a practical matter, we cannot expect jurors to
> "take their chances" on what might happen to them
> as a result of a guilty verdict.  Obviously,
> explicit threats to jurors or their families or
> even a general fear of retaliation could well
> affect the jury's ability to render a fair and
> impartial verdict.  Justice requires that when a
> serious threat to juror safety reasonably is found
> to exist, precautionary measures must be taken.

Id. (emphasis added).

Anonymous juries have been found to be particularly
appropriate in cases involving terrorism charges.  Indeed,
terrorism cases will generally easily satisfy the three factors
of serious charges, potential for threat to the judicial process,
and substantial publicity.  Anonymous juries have thus been
frequently ordered in such cases in both the Eastern and Southern
Districts of New York, as the cases cited in the Preliminary
Statement and below indicate.  See, e.g., Stewart, 590 F.3d at
124; Kaziu, 09 CR 660 (JG); Defreitas, 07 CR 543 (DLI), 2011 WL
317964, at *3; Al-Moayad, 03 CR 1322 (SJ); Sarachandran, 06 CR
615 (RJD); United States v. Bin Laden, 98 CR 1023 (S.D.N.Y.)
(bombings of United States Embassies in Kenya and Tanzania);
United States v. Salameh, 93 CR 180 (S.D.N.Y.) (prosecution of
1993 World Trade Center bombing); United States v. Yousef, 93 CR
180 (S.D.N.Y.) (prosecution of plot to bomb American airliners

flying out of Southeast Asia); <u>United States v. Rahman</u>, 93 CR 181
(S.D.N.Y.) (conspiracy to wage war against the United States by
Sheikh Omar Abdel Rahman and others).

III. <u>Discussion</u>

An anonymous jury is appropriate in this case.  As set
forth above, there are three predominant factors relevant to the
determination of whether an anonymous jury is warranted: (1) the
seriousness of the charges against the defendant; (2) the
potential threat of corruption of the judicial process; and (3)
the expectation of potential publicity.  Each of these factors
warrants empaneling an anonymous jury here.

A.   <u>The Charges Are Serious</u>

First, the charges against the defendant are of the
highest possible seriousness.  The defendant is charged with
conspiring to kill American soldiers abroad, and then conspiring
with al-Qaeda leaders to return to the United States and conduct
a "martyrdom" attack on civilians here; his co-conspirator
actually constructed detonator explosives for the attack and
drove them to New York City as part of the plot.  After his co-
conspirator was arrested, the defendant attempted his own suicide
attack against commuters on the Whitestone Expressway so that he
could carry out his mission before being arrested.  For those
crimes, the defendant is charged with nine counts, six of which
carry potential life sentences.  Indeed, the charges here are at
least as serious as those in other cases, cited above, which were

10

held to warrant juror anonymity.  See, e.g., Stewart, 590 F.3d at
125; Quinones, 511 F.3d at 296.

     B.   The Judicial Process Is at Risk

        Second, the nature of the underlying crimes establishes
a substantial threat to the judicial process in this case.  As
set forth above, although the defendant and his co-conspirators
initially set out for Pakistan without external direction, once
in Pakistan they were recruited by al-Qaeda leaders and acted at
al-Qaeda's direction in returning to the United States to conduct
an attack.  Moreover, even putting aside the facts of this case,
al-Qaeda and its associated organizations have made clear their
intent to attack the United States, including symbols of civilian
power within the United States.  These organizations present an
undeniable worldwide threat.  See, e.g., In re Terrorist Bombings
of U.S. Embassies in East Africa, 552 F.3d 157, 173 (2d. Cir.
2008) (noting "the extreme threat al-Qaeda presented, and
continues to present, to national security").

        One need not conjure up worst-case scenarios to observe
that even the mere possibility that the defendant's co-
conspirators in al-Qaeda, or their sympathizers, might threaten
the judicial process in this case is a valid concern.  Jurors
ought not fear that disclosure of their identities or information
about their families or workplaces would expose them to any

11

unnecessary risk.[2]  See Stewart, 590 F.3d at 125 (noting "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety"); Thomas, 757 F.2d at 1364 (noting that "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict").  Juror anonymity and partial sequestration would address those concerns and assure jurors that no such risks need be taken.

C.    Publicity Surrounding the Case Has Been Extensive

This case, and related cases involving the defendant's co-conspirators, has already attracted substantial attention.  It is thus reasonable to foresee that even greater media attention is likely to attend trial proceedings which will reveal the details of the plot to attack the United States and how that plot was stopped.  Even in the absence of specific focus on jurors, such media attention would counsel in favor of juror protection.  Other cases involving terrorism charges, however, have been marked by substantial media attention on the jurors' identities and decisionmaking processes.  See, e.g., Noah Rosenberg, Arms Dealer's Own Words Convicted Him, Juror Says, N.Y. Times, Nov. 3,

---

[2]  As has been widely reported, al-Qaeda responded to the death of Osama Bin Laden in May 2011 by threatening to attack the United States and its allies in revenge.  See, e.g., Tim Lister, Eulogies and Fury: Jihadists Eager to Avenge Bin Laden's Death, CNN, May 12, 2011, http://edition.cnn.com/2011/WORLD/asiapcf/05/11/bin.laden.revenge.

2011; Benjamin Weiser, <u>A Jury Torn and Fearful In 2001 Terrorism Trial</u>, N.Y. Times, Jan. 5, 2003.  As the Second Circuit observed in <u>Barnes</u> in upholding the empaneling of an anonymous jury, "in a case that generated as much pretrial publicity as [<u>Barnes</u>] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities."  604 F.2d at 141.  The jurors ought to be assured that their identities and personal roles in the judicial process will be protected so that they may deliberate fairly, without being distracted by the potential for intrusions by reporters into their private lives.

The Second Circuit repeatedly has held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial."  <u>Paccione</u>, 949 F.2d at 1193; <u>see</u> <u>Thai</u>, 29 F.3d at 801; <u>Tutino</u>, 883 F.2d at 1132; <u>Barnes</u>, 604 F.2d at 141; <u>Koubriti</u>, 252 F. Supp. 2d at 419 (empaneling anonymous jury in material support case "to protect potential jurors from undue harassment by the media and other curiosity-seekers").

In addition, because anonymity would be useless if jurors were permitted to interact freely with the public in the courthouse during recesses and at the beginning and end of each trial day, the jurors should be kept together during recesses, taken or provided lunch as a group, and escorted to and from the courthouse in a manner designated by the Marshals Service.

13

United States v. Maldonado-Rivera, 922 F.2d 934, 967 (2d Cir.
1990).

      D.   <u>An Anonymous Jury Will Not Prejudice the Defendant</u>

          Finally, there should be no prejudice to the defendant
by the imposition of an anonymous jury.  The jurors may
accurately be informed that their identities are being withheld
due to the anticipated media interest, in order to avoid any
arguable inference that the defendant himself poses a danger to
them.  See <u>Gotti</u>, 459 F.3d at 345; <u>Thai</u>, 29 F.3d at 801 (stating
that "[s]electing an anonymous jury is not an unusual practice
and has been followed in many cases in the Federal Court.
Anonymity will ward off curiosity that might infringe on juror's
privacy"); <u>Paccione</u>, 949 F.2d at 1193 (need for anonymity
explained as protection against pressures from the media);
<u>Tutino</u>, 883 F.2d at 1133 (jury instructed that "It is a common
practice followed in many cases in Federal court to keep the
names and identities of the jurors in confidence.  This is in no
way unusual.").  The Court can issue an instruction informing the
jury in a neutral manner that anonymity is necessary to protect
them from the media and the curious, and that selection of
anonymous juries is not an unusual procedure.

          While the right to a meaningful <u>voir dire</u> of jurors is
clearly established, <u>Rosales-Lopez</u>, 451 U.S. at 188, the law is

14

clear that questioning may be limited by the Court. As the Second Circuit noted in affirming the use of an anonymous jury in <u>Barnes</u>,

> as long as a defendant's substantial rights are protected by a <u>voir dire</u> designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140.

The trial court has substantial discretion in controlling and limiting the <u>voir dire</u> process. <u>See Rosales-Lopez</u>, 451 U.S. 182, 189 (1981); <u>Barnes</u>, 604 F.2d at 137. Accordingly, a full <u>voir dire</u> may be conducted, using a questionnaire, about subjects other than the juror's name, address and employer, and the parties and counsel will have an unrestricted opportunity to observe the jurors during the <u>voir dire</u> process. <u>See, e.g.</u>, <u>Stewart</u>, 590 F.3d at 125; <u>Thai</u>, 29 F.3d at 801; <u>Paccione</u>, 949 F.2d at 1192; <u>Tutino</u>, 883 F.2d at 1133; <u>Barnes</u>, 604 at 142-43.

IV.   <u>Conclusion</u>

        For the reasons set forth above, the Court should order that the names, addresses and workplaces of members of both the <u>venire</u> and <u>petit</u> juries not be revealed, that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.


Dated:    Brooklyn, New York
           January 18, 2012


                            Respectfully submitted,

                            LORETTA E. LYNCH
                            United States Attorney
                            Eastern District of New York


            By:         /s/
                            David Bitkower
                            James P. Loonam
                            Berit W. Berger
                            Assistant U.S. Attorneys

16