UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,                          :

       -against-                                        :

FERID IMAM,                                        :
    also known as "Yousef,",                              Cr. 10-019 (S4)(RJD)
ADIS MEDUNJANIN,                                   :
    also known as "Muhammad,"
ABID NASEER,                                       :
ADNAN EL SHUKRIJUMAH,
    also known as "Hamad,"                          :
TARIQ UR REHMAN and
FNU LNU,                                           :
    also known as "Ahmad" and
    "Zahid,"                                        :

               Defendants.        :
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF ADIS MEDUNJANIN'S MOTIONS IN LIMINE

Robert C. Gottlieb, Esq
Justin Heinrich, Esq.
Stephanie Carvlin, Esq.
Mitchell Dinnerstein, Esq.
Celia Gordon, Esq.
Counsel for Adis Medunjanin
111 Broadway, Suite 701
New York, NY   10006
212-566-7766

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**…………………………………………………………1

**STATEMENT OF FACTS**…………………………………………………………………1

**ARGUMENT**

**POINT ONE**

**THE GOVERNMENT'S AL QAEDA EXPERT'S TESTIMONY SHOULD BE CAREFULLY CIRCUMSCRIBED TO PREVENT THE INTRODUCTION OF HEARSAY TESTIMONY EXCEPT AS PERMITTED BY RULE 703 OF THE FEDERAL RULES OF EVIDENCE**………………………………5

**POINT TWO**

**DUE PROCESS AND FEDERAL RULE OF EVIDENCE 106 REQUIRE THAT THE GOVERNMENT NOT BE PERMITTED TO PICK AND CHOOSE WHICH PORTIONS OF THE STATEMENT MR. MEDUNJANIN MADE TO AUTHORITIES FOLLOWING HIS ARREST ON JANUARY 7, 2009 TO ADMIT INTO EVIDENCE**…………………11

**POINT THREE**

**CERTAIN PORTIONS OF MR. MEDUNJANIN'S STATEMENTS OF SEPTEMBER 14, 2009, AND JANUARY 7-8, 2010, SHOULD BE EXCLUDED UNDER RULE 403 OF THE FEDERAL RULES OF EVIDENCE**……………………………………………………………14

**CONCLUSION**……………………………………………………………………17

## <u>TABLE OF AUTHORITIES</u>

**<u>Statutes</u>**

18 U.S.C. § 924(c)……………………………………………………………………4

18 U.S.C. § 956(a)(1)…………………………………………………………………...4

18 U.S.C.§ 2332a(a)(2)……………………………………………………………………4

18 U.S.C. § 2332b(a)……………………………………………………………………4

18 U.S.C. § 2339B……………………………………………………………………4

18 U.S.C. § 2339D………………………………………………………………………4


**<u>Federal Rules of Evidence</u>**

Rule 106………………………………………………………………………………...11

Rule 702……………………………………………………………...……1, 3, 4, 6, 8

Rule 703………………………………………………………………………5, 7, 8. 9


**<u>Cases</u>**

<u>Crawford v. Washington,</u>
        541 U.S. 36 (2004)…………………………………………………………...7

<u>Daubert v. Merrell Dow Pharms., Inc.,</u>
        526 U.S. 137 (1993)………………………………………………………….6

<u>United States v. Castro,</u>
        813 F.2d 571 (2d Cir. 1987)………………………………………………….11

<u>United States v. Farhane,</u>
        634 F.3d 127 (2d Cir. 2011)………………………………………………….6

<u>United States v. Figueroa,</u>
        618 F.2d 934 (2d Cir. 1980)…………………….……………………………16

United States v. Locascio,
    6 F.3d 924 (2d Cir. 1993)……………………………………………………………5

United States v. Matera,
    489 F.3d 115 (2d Cir. 2007)…………………………………………………………5

United States v. Mejia,
    545 F.3d 179 (2d Cir. 2008)……………………………………….……7, 9, 10

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of Adis Medunjanin's motion seeking in limine rulings on the admissibility of certain evidence at his trial. The admissibility of three types of evidence is at issue: 1) purportedly expert testimony about al Qaeda that the government will seek to admit pursuant to Federal Rule of Evidence 702; 2) testimony that the defense anticipates the government will offer through FBI Special Agent Farbod Azad and other law-enforcement witnesses that Mr. Medunjanin attempted to convert them to Islam during interrogation sessions; and 3) portions of statements that Mr. Medunjanin made during custodial interrogation on January 7, 2010.

## STATEMENT OF FACTS

Mr. Medunjanin was questioned by FBI-NYPD Joint Terrorism Task Force ("JTTF") members Farbod Azad and Angel Maysonet from approximately 2:00-2:30 a.m. until around 5:00 a.m. on September 14, 2009, while other members of the JTTF executed a search warrant at the Medunjanin home. Three days later, Mr. Medunjanin was questioned for approximately ten hours at the United States Attorney's Office in the Eastern District of New York. After being arrested on January 7, 2010, Mr. Medunjanin was interrogated again. The questioning began at New York Hospital Queens where he was receiving treatment for injuries he received as a result of a car accident, and continued at the JTTF office in Chelsea into the early hours of the morning of January 8. Questioning resumed the following morning at the FBI offices at 26 Federal Plaza. Mr. Medunjanin was indicted mid-day on January 8, 2010. During these interviews Mr. Medunjanin made admissions.

After the indictment was returned, members of the JTTF attempted to interrogate Mr. Medunjanin again. Because they were aware that Mr. Medunjanin's attorney had been trying to reach him for many hours, agents presented him with a Waiver of Speedy Arraignment form. This form stated that "attorney Robert Gottlieb has requested to speak" to Mr. Medunjanin. The form instructed Mr. Medunjanin to check one of two boxes: I do wish to speak to Mr. Gottlieb or I do not wish to speak to Mr. Gottlieb. Mr. Medunjanin checked the box indicating that he did want to speak to his attorney, and attempts to question him ended.

On March 7, 8, and 9, 2011, this Court held an evidentiary hearing to determine the admissibility of the statements Mr. Medunjanin made on January 7 and 8, 2010. During their testimony several government witnesses stated that Mr. Medunjanin made efforts to convert them to Islam or otherwise discussed religion with them during various interviews.

Special Agent Azad testified about several occasions during which Mr. Medunjanin engaged in "dawa" – "an invitation to Islam." During the September 14, 2009 interview, Mr. Medunjanin "explained that we would all be judged on our judgment day and we had been given this opportunity to convert." (Transcript of March 7, 8 and 9, 2010 Hearing -- hereinafter "H" – at 65.) Agent Azad testified that in the same interview Mr. Medunjanin also stated "Americans hate Islam and America is in the position it is in because of its support for Israel." (H66.). Mr. Medunjanin also purportedly told Agent Azad that the 911 attacks were a result of America's support for Israel and the United States was "where it was today" because of former President Jimmy Carter's policies toward Israel. (H67.) The FBI report (FD-302) that purports to summarize this interview

2

notes that Mr. Medunjanin "stated that Moses raised his arms in the presence of the enemy to show strength like the prophet Mohammed." When he was asked who his enemy was, Mr. Medunjanin purportedly laughed.

During the September 17, 2009 interview Mr. Medunjanin again began to speak about Islam. According to Agent Azad "[a]nytime there was no talking about the interview topics … [i]t was an opportunity for the defendant to conduct his dawa." Mr. Medunjanin would try to convince his interviewers that "Islam is the way that [they] should be heading." They had been given the opportunity to convert and should take it. (H72-H73.) During that interview, Mr. Medunjanin asked Agent Azad if he was Shia. (H73.) On the drive home from the session "the topic of dawa" came up again. (H76.)

On the date of his arrest Mr. Medunjanin again discussed dawa with his interviewers. (H108). The following morning when he was waiting to be arraigned, Mr. Medunjanin "was again with the dawa." During that conversation he asked Agent Azad if he had been considering what Mr. Medunjanin told him about Islam and asked if the agent was "going to make the change." (H133.)

Retired New York City Police Detective Michael Carney who had served on the JTTF in January, 2010, also testified that Mr. Medunjanin "liked to preach." On the ride from the hospital to the JTTF office in Chelsea following his arrest, Mr. Medunjanin "inquired about [Agent Carney's] religion." Detective Carney said he was a Christian, and "Mr. Medunjanin discussed the similarities between Christianity and Islam, among other things." (H28.)

Special Agent Edward Panetta discussed a conversation he had with Mr. Medunjanin at the JTTF headquarters at approximately 3:00 a.m. on January 8, 2010.

3

The interrogation had been concluded for the evening and Agents Craig Goldstein and Matep Syed were charged with watching Mr. Medunjanin. (H337.) Agent Panetta was preparing to go home. Before doing so, he brought Mr. Medunjanin some bedding. According to Agent Panetta Mr. Medunjanin was unable to sleep and wanted to continue talking. The three agents – Panetta, Syed and Goldstein – spoke with Mr. Medunjanin for approximately 45 minutes longer. During that conversation, Mr. Medunjanin asked whether Agent Goldstein was Jewish. Agent Panetta testified that Mr. Medunjanin "seemed interested in Goldstein's background." (H339.)

Following post-hearing briefing, this Court ruled that Mr. Medunjanin's statements are admissible. Several months thereafter, the government obtained a fourth superseding indictment charging Mr. Medunjanin with (1) conspiring to use weapons of mass destruction against persons or property in the United States, in violation of 18 U.S.C.§ 2332a(a)(2); (2) conspiring to commit murder abroad, in violation of 18 U.S.C. § 956(a)(1); (3) providing material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (4) conspiring to provide material support to al-Qaeda, in violation of 18 U.S.C. § 2339B; (5) receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D; (6) conspiring to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a); (7) attempting to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a); and (8) two counts of possessing a destructive device in furtherance of crimes of violence, in violation of 18 U.S.C. § 924(c). Jury selection is set to commence on April 2, 2012.

The government has informed the defense that it intends to introduce at trial expert testimony pursuant to Federal Rule of Evidence 702 from several scientists

employed by the FBI. In addition, the government has given notice that it will seek to introduce testimony from Evan Kohlmann, a purported expert on al Qaeda, pursuant to Rule 702. In a letter dated February 27, 2012, the government proffered that if permitted by this Court, Mr. Kohlmann will testify "about the structure and personnel of al-Qaeda, and its official media wing As-Sahab." (Letter of February 27, 2012 at 2.) The government would also offer testimony from Mr. Kohlmann about "other radical media available on the internet, including, but not limited to speeches by Anwar al-Awlaki and Abdullah el-Faisal." (<u>Id</u>.)

## <u>POINT ONE</u>

## <u>MR. KOHLMANN'S TESTIMONY SHOULD BE CAREFULLY CIRCUMSCRIBED TO PREVENT THE INTRODUCTION OF HEARSAY TESTIMONY EXCEPT AS PERMITTED BY RULE 703 OF THE FEDERAL RULES OF EVIDENCE</u>

Rule 702 of the Federal Rules of Evidence provides that one who is qualified as an expert by virtue of "knowledge, skill, experience, training or education" may provide opinion testimony if four conditions are met. The witness's "specialized knowledge" must help the trier of fact understand the evidence or determine a fact in issue. The testimony must be based on sufficient facts or data. The principles and methods used by the expert must be reliable, and the expert must have reliably applied those methods to the facts of the case.

The Second Circuit has repeatedly held that the use of expert testimony to provide a jury with background on criminal organizations is proper in the appropriate case. <u>United States v. Matera</u>, 489 F.3d 115, 121 (2d Cir. 2007)(officer's testimony abut organization and structure of New York organized crime families); <u>United States v. Locascio</u>, 6 F.3d 924, 936 (2d Cir. 1993)(FBI agent's testimony about the rules of

organized crime and meaning of coded conversations). In <u>United States v. Farhane,</u> 634 F.3d 127 (2d Cir. 2011), the Second Circuit upheld the District's Court conclusion that testimony about al Qaeda's history and structure given by Mr. Kohlmann satisfied the requirements of Rule 702 and <u>Daubert v. Merrell Dow Pharms., Inc</u>., 526 U.S. 137, 152 (1993). The testimony qualified as expert testimony within the meaning of the rule because it demonstrated "specialized knowledge" about al Qaeda. The principals and methods Mr. Kohlmann used in reaching his conclusions had undergone adequate peer review and were generally accepted within the relevant community. Additionally, Mr. Kohlmann's testimony would be helpful to the jury in understanding how al Qaeda functioned. Finally, the Court concluded that the testimony was relevant to the issues before the jury in that case.

In <u>Farhane</u> the defendant, Sabir, was an American born doctor whom the government claimed had provided material support to al Qaeda by serving as the organizations "on call doctor" in Saudi Arabia. To prevail on these charges the government had to prove that Sabir knew that by serving in that capacity he was providing support to an organization that engaged in terrorism. Mr. Kohlmann's testimony, which described what information about al Qaeda's terrorist activities in Saudi Arabia was generally available on the internet and elsewhere, helped the government establish that Sabir must have known the implications of his actions, and the testimony thus was relevant.

In light of this case law, Mr. Medunjanin does not contend that Mr. Kohlmann could not be qualified to provide some expert testimony about al Qaeda. However, the Second Circuit has been equally consistent in holding that expert testimony of this sort

must be strictly monitored by the District Court to avoid violating the strictures of Rule 703 and a defendant's right to confrontation.

Most recently in United States v. Mejia, 545 F.3d 179 (2d Cir. 2008), the Second Circuit extensively analyzed the legal problems that this type of testimony may present. In Mejia, the government charged several members of MS-13, a gang that originated in El Salvador, with racketeering and with narcotics, weapons and assault charges related to the enterprise. At trial the government sought to call an officer with the New York State Police as an expert witness. Defense counsel moved to exclude the evidence, arguing that the witness did not qualify as an expert and that his proposed testimony would incorporate hearsay in violation of Crawford v. Washington, 541 U.S. 36 (2004). The District Court disagreed and permitted Alicea to testify.

In his testimony, Officer Alicea talked generally about MS-13's history, rules, practices, local structure, leadership and division of responsibilities. He also gave more specific testimony about MS-13's activities on Long Island. According to Officer Alicea, the police had seized between 15-25 weapons from MS-13 members during a specific time frame. Members of the group had been arrested for dealing narcotics, primarily cocaine, and the gang also occasionally dealt marijuana. Officer Alicea attested that MS-13 had committed between 18 and 23 murders on Long Island between June 2000 and the trial. He described a drug tax the group purportedly collected for permitting non-members to sell narcotics on MS-13 turf.

On cross-examination, Officer Alicea identified several sources for his information. He had read articles, including reports from other law-enforcement personnel. He had participated in somewhere between 15 and 50 custodial

interrogations of MS-13 members, and some of his information came from custodial interrogations with gang members that he conducted as part of the investigation in that prosecution. Officer Alicea could not distinguish between information he had gleaned from those interrogations and from other sources. His knowledge was a combination of the two.

Defendants Vasquez and Castro were convicted on all but the narcotics-trafficking count and appealed, arguing inter alia that admission of Alicea's testimony ran afoul of the requirements of Rules 702 and 703 of the Federal Rules of Evidence and violated their Sixth Amendment right to confrontation. The Second Circuit agreed.

Much of Officer Alicea's testimony violated the first requirement of Rule 702: that it concern matters that the average juror is not capable of understanding on his own. The Circuit Court cited several examples of portions of the testimony it considered illustrative of this problem: No expertise was required to understanding that 15-25 firearms had been seized from MS-13 members, that members of the gang had been arrested for dealing narcotics or that MS-13 had committed between 18 and 23 murders on Long Island. These were facts (readily of susceptible of proof via lay witness testimony, death records and police reports) that "concerned material well within the grasp of the average juror." <u>Mejia</u>, 545 F.3d at 194. By relaying what in essence were facts, Alicea strayed beyond his role as expert.

Alicea's testimony also violated Rule 703. While Rule 703 permits experts to rely on hearsay if experts in the filed reasonably rely on such evidence in forming their opinions, an expert "may not, however, simply transmit that hearsay to the jury." <u>Mejia</u>, 545 F.3d at 197. Rather, an expert must filter that hearsay through some special skill,

knowledge or training to form an opinion, which may be communicated to the jury. "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the Government to circumvent the rules prohibiting hearsay." Id. (internal citations and quotation marks omitted). Much of Alicea's testimony did not involve an analysis of his source material but rather merely repeated it to the jury.

The Second Circuit found that "for similar reasons, some of Alicia's testimony also violated Crawford." Mejia, 545 F.3d at 198. Crawford held that a defendant's rights under the Sixth Amendment are infringed if testimonial hearsay is admitted into evidence unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine the witness. This confrontation right may conflict with Rule 703, which permits expert opinion that is based in part on testimonial hearsay. The question that must be asked to determine whether Crawford is violated by this type of testimony the Second Circuit held, "is whether the expert applied his expertise to those statements but did not directly convey the substance of the statements to the jury." Id. (internal citation and quotation marks omitted). The Second Circuit in Mejia "was at a loss in understanding how Alicea might have 'applied his expertise'" to some of the hearsay statements he incorporated into his evidence. The Court found that admission of the evidence was error and vacated the appellants' convictions.

There is reason to believe that the proposed expert testimony in this case could cross these lines, as well. It is unclear exactly what the scope of Mr. Kohlmann's would be. The government has stated that it intends to provide a written report from Mr. Kohlmann but has not yet done so. However, the government has turned over to the

defense voluminous Jencks Act material for Mr. Kohlmann, which includes more than a dozen transcripts of testimony he has provided in other cases. In those trials, Mr. Kohlmann described the sources for his testimony as falling into three categories: primary research, which includes interviewing members of terrorist organizations[1]; secondary research, which includes reviewing communiqués and videos purportedly issued by al Qaeda or its affiliate groups, and tertiary research, which includes reading newspaper articles or intelligence reports. Thus, Mr. Kohlmann's testimony in this case, if it mirrors that he has given in other cases, clearly would incorporate hearsay, likely including testimonial hearsay. Given this fact, and the Second Circuit's admonition in Mejia and other cases that the District Courts must patrol the "increasingly thin line [that] separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence," it is respectfully submitted that the government should be required to proffer the scope Mr. Kohlmann's proposed testimony. Mejia, 545 F.3d at 190. Additionally, Mr. Medunjanin should be permitted to conduct a voir dire of Mr. Kohlmann outside the presence of the jury before he is permitted to testify.

---

[1]According to Mr. Kohlmann his sources include incarcerated cooperating defendants in terrorism cases.

10

**POINT TWO**

**DUE PROCESS AND FEDERAL RULE OF EVIDENCE 106 REQUIRE THAT THE GOVERNMENT NOT BE PERMITTED TO PICK AND CHOOSE WHICH PORTIONS OF THE STATEMENT MR. MEDUNJANIN MADE TO AUTHORITIES FOLLOWING HIS ARREST ON JANUARY 7, 2009 TO ADMIT INTO EVIDENCE**

Rule 106 of the Federal Rules of Evidence codifies the so-called rule of completeness. Under this doctrine, if a party introduces only a portion of a statement, an adverse party "may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time." Fed.R.Evid. 106. An omitted portion of a statement meets this test and must be "placed in evidence, if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." United States v. Castro, 813 F.2d 571, 575-76 (2d Cir. 1987). While it is not yet clear exactly what portions of the January 7-8, 2009 statement Mr. Medunjanin made to law enforcement that the government will seek to introduce, it is reasonable to conclude that the government will introduce admissions that are contained in the statement. It is equally apparent that certain other portions of the statement provide the context the jury will need to evaluate the meaning of those admissions.

Following his arrest on January 7, 2009, Mr. Medunjanin was questioned by members of the JTTF for a period that spanned approximately 19 hours. The questioning began at New York Hospital Queens at around 5:14 p.m. when Mr. Medunjanin arrived there following a car crash. It continued until he was discharged at 7:28 p.m. After leaving the hospital, Mr. Medunjanin was driven to the JTTF office in

Chelsea. Following a break for food, the interrogation resumed and continued until 2:00 a.m. to 3:00 a.m. (H115, H337.) The agents chose to end the interrogation for the evening at but Mr. Medunjanin initiated further conversation with Agents Panetta, Syed and Goldstein thereafter. This conversation continued for approximately 45 minutes, but no new information was elicited. (H338.) The following morning, Agent Azad moved Mr. Medunjanin to 26 Federal Plaza for processing. At around noon, questioning began again and continued for approximately one hour. (H298-H300.) Soon thereafter, Mr. Medunjanin indicated that he wanted to speak to his attorney, and he was not interrogated any further.

During these interrogation sessions, Mr. Medunjanin told members of the JTTF that following a hajj trip he made in January of 2008, he became aware of news reports that focused on how Muslims were being treated at Abu Ghraib prison. He felt he had to do something to help his fellow Muslims. He decided that he would go to Afghanistan to join the Taliban. Najibullah Zazi and Zarein Ahmedzay shared similar feelings, and the three decided they would go to Afghanistan together. The plan called for the friends to fight against United States troops. They had no intention of joining al Qaeda. That group conducted suicide missions, and Mr. Medunjanin was not interested in doing that. His goal was to become a great general who would lead Taliban troops in battle.

Mr. Medunjanin described how he, Zazi and Ahmedzay traveled to Pakistan in 2008. Once there, they attempted to cross into Afghanistan to fulfill their goal of joining the Taliban. However, the three were turned away by the Pakistan army and had to return to Mr. Zazi's uncle's house in Peshawar.

Mr. Medunjanin told the JTTF how he sought other means to enter Afghanistan, including making inquires at a local mosque. The day after he did so, two strangers arrived at Mr. Zazi's uncle's house. One of the men introduced himself as Abdullah and said he was there to take the three young men for training. Messrs. Medunjanin, Zazi and Ahmedzay travelled with Abdullah, ultimately arriving at a house in Miram Shah. Several days later, the three met "Abdul Hafeez" and "Ibrahim." It was only then that the idea of suicide missions was broached. Abdul Hafeez and Ibrahim agreed to take Mr. Medunjanin to a training camp, but they also tried to solicit him to conduct a suicide mission. He discussed the proposal with Messrs. Zazi and Ahmedzay. The three did want to go to the training camp but remained unwilling to commit a suicide attack.

Abdul Hafeez ultimately connected Messrs. Medunjanin, Zazi and Ahmedzay with a Pashtun man he identified as Yusef. They stayed with Yusef for two weeks. During that time, Yusef provided religious and military weapons training. Mr. Medunjanin told the JTTF interrogators that he never shot weapons at U.S. troops, or indeed at any target other than the mountains. Mr. Medunjanin admitted that he knew it was al Qaeda that was providing the training in part because Abu Hafeez twice tried to solicit Mr. Medunjanin to conduct a suicide mission. Specifically, Abu Hafeez asked Mr. Medunjanin to attack either the Pakistani Inter Services Intelligence or a high-ranking member of the Pakistani army. Mr. Medunjanin refused to undertake the proposed suicide missions but offered to return to America and send money to Abdul Hafeez. Mr. Medunjanin denied that he had any discussions that involved targets or missions in the United States. He also told his interrogators that he was not aware of any plans to commit any operation or attacks in the United States.

13

As this description of the January 7-8 interrogation makes clear, each of the statements formed part of Mr. Medunjanin's singular narrative of the events that occurred in September of 2008. If the government seeks to introduce Mr. Medunjanin's statement that he received military and religious training from al Qaeda, his statement that his original intent was to travel to Pakistan to fight with the Taliban in Afghanistan should also be admitted. Otherwise the jury would be left with the clear misimpression that Mr. Medunjanin went to Pakistan to join al Qaeda. Similarly, the jury should know that Mr. Medunjanin denied any interest in conducting suicide missions. If the jury hears that Mr. Medunjanin admitted that he fired weapons, it should also know that stated that he never fired at human targets. These portions of the statement provide the context necessary for the jury to evaluate the other portions of the statement.

## POINT THREE

### CERTAIN PORTIONS OF MR. MEDUNJANIN'S STATEMENTS OF SEPTEMBER 14, 2009, AND JANUARY 7-8, 2010, SHOULD BE EXCLUDED UNDER RULE 403 OF THE FEDERAL RULES OF EVIDENCE

Rule 403 of the Federal Rules of Evidence directs a District Court to exclude evidence if "its potential for unfair prejudice substantially outweighs its probative value." Evidence is unfairly prejudicial if "has a high possibility of juror misuse" and is of limited relevance. United States v. Curley, 639 F.3d 50, 57 (2d Cir. 2011). Under this standard, this Court should rule that certain portions of the statements Mr. Medunjanin made on September 14, 2009, and January 7-8, 2010, may not be admitted into evidence.

Several times while being questioned by members of the JTTF on September 14, 2009, and January 7-8, 2010, Mr. Medunjanin discussed religion. According to Agent Azad, Mr. Medunjanin repeatedly tried to convert him to Islam, starting with the

September 14, 2009 interview during which Mr. Medunjanin told Azad that everyone would be judged on judgment day and urged him to repent. During that same interview Mr. Medunjanin purportedly said that "Americans hate Islam and America is in the position it is in because of its support for Israel." Mr. Medunjanin also supposedly told Agent Azad that the 911 attacks were a result of America's support for Israel and the United States was "where it was today" because of former President Jimmy Carter's policies toward Israel. (H67.) The FBI report (FD-302) that purports to summarize this interview notes that Mr. Medunjanin "stated that Moses raised his arms in the presence of the enemy to show strength like the prophet Mohammed." According to Agent Azad, when Mr. Medunjanin was asked who his enemy was, he laughed. He folded his arms in front of himself and explained that he did this, "just like the prophet," in defiance of his interrogators.

During the September 17, 2009 interview Mr. Medunjanin repeatedly initiated discussions about religion. According to Agent Azad, Mr. Medunjanin engaged in dawa whenever possible. He tried to convince his interviewers that they had been provided with an opportunity to convert, and they should take it. (H72-H73.) Mr. Medunjanin asked Agent Azad if he was Shia. (H73.)

On the date of his arrest Mr. Medunjanin "was again with the dawa." He asked Agent Azad if he had been considering their previous discussion about Islam, and Mr. Medunjanin asked if the agent was "going to make the change." (H133.) On the ride from New York Hospital Queens to the JTTF office, Mr. Medunjanin asked Agent Michael Carney if he was a Christian and discussed the similarities between Christianity

15

and Islam. (H28.) Later that evening, Mr. Medunjanin asked whether one of his interrogators, FBI Special Agent Goldstein, was Jewish.

None of these statements – Mr. Medunjanin's repeated entreaties of the agents to convert to Islam, his discussion of Moses, his queries about various agents' religious backgrounds – bears any great relevance to the charges at issue in this case or is necessary to place the admitted portions of the statements in context. At most what these statements show is a preoccupation on Mr. Medunjanin's part with Islam. On the other hand, the evidence has a high probably of juror misuse. Admission of this evidence invites the jurors to make an inference that this Court will instruct them is impermissible to make: that because Mr. Medunjanin is a Muslim he is more likely to have committed the charged criminal offense. Similarly, the statement that ties the 911 attacks with America's support for Israel, is incendiary. Its admission brings with it the strong probability of having an adverse effect upon Mr. Medunjanin "beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).

These portions of Mr. Medunjanin's statements should not be admitted.

## **CONCLUSION**

For the reasons stated herein, the Court should grant the requested relief.


Dated:        New York, New York
              March 12, 2012


                                              Respectfully submitted,


                                              _____/s/_____
                                              Stephanie Carvlin sc9161
                                              Justin Heinrich
                                              Robert C. Gottlieb
                                              Mitchell Dinnerstein
                                              Celia Gordon
                                              Counsel for Adis Medunjanin

17