

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMB:JPL/BWB                               *271 Cadman Plaza East*
F.#2010R00057                             *Brooklyn, New York  11201*

March 21, 2012


The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Adis Medunjanin
>       Criminal Docket No. 10-19 (S-4)(RJD)

Dear Judge Dearie:

The government respectfully submits this letter in response to the motion in limine filed by the defendant on March 12, 2012.  In his motion, the defendant argues (1) that the testimony of expert witness Evan Kohlmann should be carefully circumscribed to conform with Rule 703 of the Federal Rules of Evidence; (2) that certain portions of the defendant's post-arrest statements should be admitted into evidence as necessary context for the defendant's admissions; and (3) that the government should be precluded from introducing others portions of the defendant's statements because they are unfairly prejudicial.  The government respectfully submits that for the reasons set forth below, the defendant's motion should be granted in part and denied in part.

I.    The Testimony of Evan Kohlmann

At trial, the government intends to call Evan Kohlmann as an expert witness on al-Qaeda.  Mr. Kohlmann specializes in tracking al-Qaeda and other contemporary terrorist movements.  He holds a degree in International Politics from the Edmund A. Walsh School of Foreign Service at Georgetown University, and a law degree from the University of Pennsylvania Law School.  He also holds a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding at Georgetown University.  He currently works as a senior partner at Flashpoint

Global Partners, a New York-based security consulting firm. He additionally serves as an on-air analyst for NBC News in the United States and as an investigator with the NEFA Foundation. He is the author of the book <u>Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network</u>, Berg/Oxford International Press, London, 2004, which has been used as a teaching text in graduate-level terrorism courses offered at, for example, Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies. As part of his research, Mr. Kohlmann has amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. Mr. Kohlman has testified as an expert witness in United States federal and military courts in twenty one criminal cases. He has also testified as an expert witness in foreign proceedings.

The government expects Mr. Kohlmann to testify about the history, structure and personnel of al-Qaeda, and its official media wing As-Sahab. We also anticipate that Mr. Kohlmann will testify about other radical media available on the internet, including, lectures by Anwar al-Awlaki and Abdullah el-Faisal. Furthermore, we anticipate that Mr. Kohlmann will testify about the history and significance of the jihadist phrase "We love death as you love life." Mr. Kohlmann is finalizing his expert report, which will be provided to the defense forthwith. The government disclosed Jencks Act material for Mr. Kohlmann on February 27, 2012.

In his motion, the defendant generally concedes Mr. Kohlmann's qualifications, but argues that his testimony should be carefully circumscribed to avoid running afoul of <u>United States v. Mejia</u>, 545 F.3d 179 (2d Cir, 2008). The government agrees.

    A.    <u>Applicable Law</u>

The admissibility of expert testimony is governed by Rule 702, of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

2

>     methods, and (3) the witness has applied the
>     principles and methods reliably to the facts
>     of the case.

Fed. R. Evid. 702.

The Court performs a gatekeeping role in ensuring that expert testimony satisfies the requirements of Rule 702. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993) (discussing non-exhaustive list of criteria court may apply in performing gatekeeping function). The inquiry is "a flexible one," id. at 594, and courts enjoy considerable discretion in deciding the admissibility of expert testimony, see Kumho Tire, 526 U.S. at 152.

Pursuant to Rule 703 of the Federal Rules of Evidence, expert testimony may be based on otherwise non-admissible hearsay. Rule 703 states:

>     An expert may base an opinion on facts or
>     data in the case that the expert has been
>     made aware of or personally observed. If
>     experts in the particular field would
>     reasonably rely on those kinds of facts or
>     data in forming an opinion on the subject,
>     they need not be admissible for the opinion
>     to be admitted. But if the facts or data
>     would otherwise be inadmissible, the
>     proponent of the opinion may disclose them
>     to the jury only if their probative value in
>     helping the jury evaluate the opinion
>     substantially outweighs their prejudicial
>     effect.

Fed. R. Evid. 703; accord United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993) (upholding an FBI agent's expert testimony about the internal operating rules of organized crime families, the meaning of recorded conversations, and the identification of members of the Gambino crime family); United States v. Feliciano, 223 F.3d 102, 109 (2d Cir. 2000) (upholding an FBI agent's expert testimony about the structure, leadership, practices, terminology, and operations of the Los Solidos street gang); United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) (upholding the admission of an officer's expert testimony "about the composition and structure of New York organized crime families" and observing that the district court had limited the

expert's testimony to general information rather than information about the defendants themselves).

However, an expert witness may not communicate "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." Mejia, 545 F.3d at 193 (internal quotation marks omitted). Furthermore, although an expert witness may rely on hearsay to form his or her opinions, an expert may not "simply transmit that hearsay to the jury . . . . Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the Government to circumvent the rules prohibiting hearsay." Id. at 197 (internal quotation marks omitted).

B. Discussion

Mr. Kohlmann's expected testimony as an expert on al-Qaeda will fall well within the boundaries established by Second Circuit precedent, including Mejia. Indeed, the Second Circuit has specifically approved of similar testimony by Kohlmann after the Mejia decision. See United States v. Farhane, 634 F.3d 127 (2d Cir. 2011). In Farhane, which was decided three years after Mejia, the Circuit held that the district court properly admitted Kohlmann's expert testimony regarding "(1) the origins and history of the al Qaeda terrorist organization; (2) the structure and leadership of al Qaeda; (3) al Qaeda terrorist training camps, instructional methods, and operational logistics; (4) specific acts of terrorism perpetrated by al Qaeda, including acts of terrorism in Saudi Arabia; and (5) Azzam Publications, producers of jihadi videos such as 'Martyrs of Bosnia.'" United States v. Sabir, 2007 WL 1373184, *2 (S.D.N.Y. May 10, 2007) aff'd by Farhane, 634 F.3d 127 (2d Cir. 2011). The Second Court found that Kohlmann was qualified as an expert under Rule 702 and that his testimony was helpful and relevant to the jury. See id. at 159-160.

In this case, Kohlmann will testify to many of the same topics already specifically approved in Farhane, namely the history, structure and personnel of al-Qaeda, and related jihadist propaganda. See Farhane, 634 F.3d at 159-160. Furthermore, the government has instructed Kohlmann to not base any of his opinion on interviews of cooperating witnesses: Kohlmann has not interview any of the government's witnesses, and has reviewed portions of the witnesses's statements only to enable him to identify the specific pieces of jihadist propaganda

4

described by the witnesses. Kohlmann is expected to testify at trial about the content and provenance of this propaganda based on his previously established expertise. Finally, although Mr. Kohlmann's expected testimony concerning the phrase "We love death as you love life" was not addressed in Farhane, this testimony will be based on historical texts and jihadist pronouncements, rather than information obtained from informants or cooperating witnesses.[1]

## II. The Defendant's Post-Arrest Statements

On January 7, 2010, the defendant was arrested after deliberately crashing his car into another car on the Whitestone Expressway. He was subsequently interviewed over the course of two days by agents of the Federal Bureau of Investigation ("FBI") and detectives of the New York City Police Department ("NYPD") assigned to the New York Joint Terrorism Task Force ("JTTF").

The defendant initially made statements to surveillance agents present on the scene immediately after the defendant crashed his car. After the crash, the defendant got out of his car, ran to the highway median, and jumped over the median. (Tr. 217-18).[2] He was pursued by Special Agent Ted Roese, as well as an off-duty Suffolk County Police Officer who had observed the collision. (Tr. 217-18). Agent Roese approached the defendant and placed him in handcuffs. (Tr. 218-19). Another member of the surveillance team, Special Agent Aaron Spivack, took custody of the defendant and walked him across the highway to a grassy area away from oncoming traffic. (Tr. 16-17, 219). Although the defendant did not have any apparent injuries, Agent Spivack informed him that an ambulance was on its way, and asked him whether he was alright. (Tr. 19). Rather than responding to Agent Spivack's question, the defendant asked Agent Spivack if he was Jewish. (Tr. 19-21). When Agent Spivack acknowledged that he was Jewish, the defendant began explaining to Agent Spivack, in substance, his view of the problems with Judaism. (Tr. 20, 35). Shortly thereafter the defendant was transported to the hospital for evaluation.

---

[1] The government will confer with defense counsel after counsel has an opportunity to review Kohlmann's expert report to determine whether voir dire of Kohlmann is necessary prior to his testimony.

[2] "Tr." refers to the transcript of the suppression hearing held on March 7-9, 2011. "Ex." refers to exhibits admitted during that hearing.

5

The defendant made further statements after arriving at the hospital on January 7, 2010, and continued speaking with agents after he was transported to the FBI office and into the early morning hours of January 8, 2010. Initially, the defendant informed the agents that he would talk about his own actions, but not implicate anyone else. (Tr. 100, 285). As the interview progressed, the defendant agreed to speak about Najibullah Zazi and Zarein Ahmedzay as well. (Tr. 100, 289). The defendant admitted that he had crashed his car in an attempt to kill himself and others because he believed that he needed to carry out an act of jihad before he was arrested. (Tr. 101-02, 286-87). The defendant said that he believed he would be arrested because a detective had used the name "Muhammad" during the execution of a search warrant earlier that day, indicating that the agents knew about the defendant's activities in Pakistan. (Tr. 288). The defendant stated that he had looked up the statutes listed on the search warrant and saw that he faced a sentence of twenty-five or thirty years to life imprisonment. (Ex. 9 at 2). The defendant also stated that he thought of himself as a prisoner of war, and of the agents as enemy soldiers. (Tr. 101, 286). As enemies, they did not have to like one another, but they could speak with one another in a civilized way. (Tr. 295). The defendant then requested to be exchanged in a prisoner swap for an American soldier captured in Afghanistan. (Tr. 101, 286).

After the defendant was cleared by medical staff the agents drove the defendant back to an FBI office in Manhattan. (Tr. 108, 290). Over the course of the interview, the defendant admitted that he, Zazi, and Ahmedzay had traveled to Pakistan with the intent to join the Taliban and kill American soldiers in Afghanistan, but that they had instead received military training from al-Qaeda. (Tr. 113-14; Ex. 9).

Toward the end of the fist day's interview, in the early morning of January 8, agents informed the defendant that he was being charged with receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D. (Tr. 127, Ex. 10). They asked him whether he wanted to continue talking with them the next morning or, alternatively, to go to court to be arraigned. (Tr. 117-18). The defendant said he wanted to keep talking to the agents. (Tr. 118).

FBI Special Agent Edward Panetta then provided the defendant with bedding so that he could sleep on the couch in the interview room. (Tr. 337). Although it was past midnight, the defendant told Agent Panetta that he did not want to sleep, but rather wanted to continue talking. (Tr. 337-38). The defendant

6

then spoke with Agent Panetta for approximately another half an hour, until Agent Panetta told the defendant that it was time to go to sleep. (Tr. 341).

The defendant gave his third set of statements the next afternoon after agents took the defendant to another FBI office for processing. (Tr. 120-21, 298). At approximately 12:20 p.m., during the processing, the agents reinitiated the interview of the defendant. (Tr. 121). During this interview, the defendant further discussed his training with al-Qaeda, and al-Qaeda leaders' attempts to recruit him to be a suicide bomber. (Tr. 124, 299; Gov. Ex. 13).

In the afternoon on January 8, 2010, the defendant was indicted by a grand jury in the Eastern District of New York for conspiring to commit murder abroad, in violation of 18 U.S.C. § 956(a), and receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D. (Tr. 127). When the agents presented the defendant with a waiver of speedy arraignment form, the defendant stated that he disagreed with the decision to charge him with conspiring to commit murder. (Tr. 128-29, 301). The defendant then stated, in substance, that maybe he should talk to his attorney, and invoked his right to do so. (Tr. 129, 301). At this point, the agents stopped questioning the defendant. (Tr. 130, 301).

A. Applicable Law

A defendant's statement to law enforcement following his arrest may be offered into evidence by the government on two possible bases:

> When the government offers in evidence the post-arrest statement of a defendant it commonly does so for either of two reasons. It may wish to use the statement to establish the truth of the matter stated. In these circumstances, under Rule 801(d)(2)(A) the statement is not hearsay, because it is simply a statement of the opposing party. On the other hand, the government may wish to offer the statement to show that the defendant made false representations to the authorities, from which the jury could infer a consciousness of guilt, and hence guilt.

United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).

7

The defendant does not have a parallel ability to offer his own statements into evidence. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible. When the defendant offers his own statement simply to show that it was made, rather than to establish the truth of the matter asserted, the fact that the statement was made must be relevant to the issues in the lawsuit." Id.

The government is under no obligation to offer exculpatory statements when it offers inculpatory admissions. See United States v. Johnson, 507 F.3d 793 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the defendant's post-arrest statement); United States v. Branch, 91 F.3d 699, 728 (5th Cir. 1996) (finding that "self serving [exculpatory] statement that does not contradict, explain, or qualify the rest of the statement" did not need to be offered by Government under rule of completeness when government offered inculpatory statements); United States v. Smith, 794 F.2d 1333, 1335-36 (8th Cir. 1986) (holding that district court did not err in precluding cross-examination on portions of post-arrest statement describing relationship to co-defendant and implicating co-defendant when government offered admission that defendant had been present at time of co-defendant's arrest).

Nevertheless, there are certain instances when a defendant may require the admission of certain portions of a post-arrest statement when the Government offers excerpts of a post-arrest statement. Rule 106 "is stated as to writings in Fed. R. Evid. 106, but Fed. R. Evid. 611(a) renders it substantially applicable to oral testimony." United States v. Alvarado, 882 F.2d 645, 650 n.5 (2d Cir. 1989). "Under this principle, an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." United States v. Jackson, 180 F.3d 55, 73 (2d Cir.), on reh'g, 196 F.3d 383 (1999).

"The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Marin, 669 F.2d at 84-85. The burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the government intends to offer. See United States v. Glover, 101 F.3d 1183,

8

1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent."). The district court has broad discretion in applying the completeness doctrine. See Jackson, 180 F.3d at 73 (district court's application of rule of completeness is reviewed only for abuse of discretion).

B. Discussion

The defendant argues that if the government seeks to introduce his statements regarding his al-Qaeda training, it must also elicit, under the rule of completeness, (1) that he initially intended to travel to Pakistan to fight with the Taliban; (2) that he ultimately declined to perform a suicide mission; and (3) that he never fired weapons at human targets. While the government disagrees with some of the defendant's reasoning, it has no objection to admitting those portions of the statements.

The government, however, does not seek to elicit the defendant's statement that he reviewed the search warrant left at his house and observed that the statutes listed on the warrant carried a sentence of twenty-five or thirty years to life imprisonment. (Ex. 9 at 2). The government respectfully submits that this statement is not necessary to provide context to the defendant's statement that he believed he was going to be arrested. Moreover, the statement is prejudicial to the government not only because it improperly puts sentencing provisions before the jury, but because that sentencing information is incorrect: the statutes listed on the warrant do not carry a sentence of twenty-five or thirty years to life imprisonment.

The jury's fact-finding should bot be tainted by consideration of the possible consequences of a defendant's conviction. See United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences."). "Where the jury is permitted to speculate concerning a defendant's possible punishment, a jury cannot properly perform the function' of determining guilt or innocence based upon an impartial consideration of the evidence, unswayed by emotion, fear or prejudice." United States v. Cook, 776 F.Supp. 755, 757 (S.D.N.Y. 1991) (citing Rogers v. United States, 422 U.S. 35 (1975); United States v. Glick, 463 F.2d 491 (2d Cir. 1972)); United States v. Goodface, 835 F.2d 1233 (8th Cir. 1987).

9

III. <u>The Defendant's Statements About Religion and Politics</u>

The defendant next moves to exclude evidence of his political views regarding American foreign policy and Islam, and well as of his various attempts to convert federal agents to Islam or engage them in religious discussions. The defendant claims that such evidence will be substantially more prejudicial than probative under Federal Rule of Evidence 403 because it is incendiary, and because jurors might infer that he is guilty from the fact that he is Muslim. Both arguments are without merit.

A. <u>Applicable Law</u>

Pursuant to Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Mere prejudice, of course, is not sufficient to exclude relevant evidence, since all inculpatory evidence is, by definition, prejudicial. To be excludable under Rule 403, the prejudice must be "unfair," in the sense that the evidence has some "adverse effect beyond tending to prove the fact or issue that justified its admission into evidence." <u>United States v. Gelzer</u>, 50 F.3d 1133, 1139 (2d Cir. 1995); <u>United States v. Kaplan</u>, 490 F.3d 110, 122 (2d Cir. 2007); <u>United States v. Figueroa</u>, 618 F.2d 934, 943 (2d Cir. 1980). "To avoid acting arbitrarily, the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." <u>United States v. Salameh</u>, 152 F.3d 88, 110 (2d Cir. 1998). See <u>United States v. Abu-Jihaad</u>, 553 F. Supp. 2d 121 (D. Conn. 2008) (holding graphic photos and videos which glorified martyrdom were admissible under Rule 403 analysis ).

B. <u>Discussion</u>

First, the defendant's strongly-held political views regarding American foreign policy – that "Americans hate Islam" and that American support for Israel is a cause of anti-American sentiment and violence – are highly probative of the defendant's motive and intent to commit the charged crimes. The defendant is charged with conspiring to travel to Afghanistan, join the Taliban, and kill American soldiers. He is also charged with conspiring to commit a suicide attack against American civilians on behalf of al-Qaeda, a terrorist organization dedicated to attacking the United States and establishing worldwide Islamic rule. That the defendant holds disputes with American policy in the Middle East, and that he believes the United States is anti-Muslim, is plainly relevant to why the defendant, an American citizen of Bosnian descent, would commit such crimes. See <u>United States v. Woodlee</u>, 136 F.3d 1399, 1410 (10th Cir. 1998)

10

(testimony concerning defendant's past racial animosity admissible to prove motive element of criminal civil rights offense); United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996) (evidence of racist views admissible to prove "context, motive, and setup" of racially-charged murders, and "necessary to complete the story of the charged offenses"); United States v. Lowrey, 885 F.2d 871 (6th Cir. 1989) (witness reports of defendant's racist statements, although potentially prejudicial, admissible because they illustrated the defendant's motivation). Indeed, it would be difficult to explain to a jury why an American citizen with no connection to Afghanistan would conspire to commit such crimes without holding extremist views on the role of Islam in the world, and American foreign policy regarding Muslim regions.

Moreover, there is little chance that the jury's prejudices will be inflamed by the statements described above. The jury will have already seen evidence that the defendant actually sought to kill American soldiers, received military training toward that end, agreed to conduct a suicide attack, and actually attempted to kill himself and others on a New York City expressway. With specific reference to the defendant's motive and intent, the government will rely not only on the statements he made to the FBI,[3] but also on the testimony of his co-conspirators about their shared views on Islam, jihad, and the American military presence in Iraq and Afghanistan; evidence concerning the defendant's and his co-conspirators' consumption and possession of jihadist propaganda by al-Awlaki and others; and evidence concerning al-Qaeda propaganda videos that were shown to the defendant and his co-conspirators as part of the recruitment process. By comparison, the statements the defendant objects to are relatively benign. See United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (Rule 403 analysis favors admission where uncharged crimes "did not involve conduct more serious than the charged crime[s] and the district court gave a proper limiting instruction"); United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) ("Furthermore, the evidence did not

---

[3] The defendant does not move to preclude his statements during the same interviews that he "does not believe that a caliphate currently exists, but would heed to call to violent jihad if one did exist"; that he agreed with and was motivated by Anwar al-Awlaki's lectures; that he was motivated by the United States's treatment of prisoners at Abu Ghraib, and felt that he had to "join the fight" to "help his fellow Muslims"; or that he viewed himself as a contemporary Nat Turner, with the United States in the role of slaveowner.

11

involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction"). In any event, they hardly suggest that the defendant committed the charged crimes because he was Muslim, and the government would agree to an appropriate limiting instruction that the jury can consider the statements only as they relate to motive and intent. See id. at 326; Williams, 205 F.3d at 33-34.

By contrast, precluding the statements might tend to cause prejudice to the government, especially given the likelihood that the defendant will seek to cross-examine the government's witnesses concerning their political and religious beliefs. For example, likely government witness Zarein Ahmedzay stated during his guilty plea allocution that "I believe that the real enemies of this country are the ones destroying this country from within. And I believe these are the special group, the Zionist Jews, I believe, who want a permanent shadow Government within the Government of the United States of America." (Tr. Guilty Plea, Apr. 23, 2010, p. 30). The defendant cannot fairly impeach Ahmdezay based on these comments while at the same time precluding reference to his own view that American support for Israel precipitated the September 11 attacks.

Second, the defendant's repeated attempts to convert members of law enforcement or engage in religious discussions with them are relevant to intent, state of mind, and the voluntariness of his post-arrest statements. Specifically, the statements are relevant to the defendant's intent and state of mind when he crashed his car on the Whitestone Expressway. That immediately after the accident he queried whether one of the surveillance agents was Jewish, that he continued the same line of inquiry with other agents that night, and that he had attempted similar conversations during prior encounters with the agents tends to establish that at the time of the crash the defendant was acting deliberately and according to a calculated decision, rather than out of emotional disturbance, panic, or paranoia. For similar reasons, the statements are relevant to the voluntariness of his post-arrest statements, which the government is required to prove affirmatively to the jury pursuant to 18 U.S.C. § 3501. The defendant's desire to engage the arresting and interrogating agents in religious debate, and his insistence on doing so even after the agents had attempted to conclude the interview for the night, tend to establish that he was speaking voluntarily. See e.g., United States v. Scarpa, 897 F.2d 63, 68-69 (2d Cir. 1990) (defendant's repeated choice to confront law enforcement without counsel indicates that defendant was "confident in his own ability to deal with law enforcement officers" and that Miranda waiver was voluntary).

With respect to prejudice, it is again difficult to perceive how the defendant's calm, even friendly attempts to engage the agents in religious discussions could result in undue prejudice in a case involving conspiracy to murder American soldiers and conspiracy to conduct a suicide bombing in New York City. The statements do not show that the defendant was more likely to commit the charged crimes because he was Muslim; if anything, they stand in contrast to the violent Islamism the defendant embraced and supported, and which he endorsed elsewhere throughout the same statements.

IV. Conclusion

For the foregoing reasons, the defendant's motion should be granted in part and denied in part.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:       /s
David Bitkower
James P. Loonam
Berit W. Berger
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of the Court (RJD) (by ECF)
      Defense Counsel