UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
UNITED STATES OF AMERICA

                            **MEMORANDUM OF DECISION**

    -against-

                                10 CR 019

ADIS MEDUNJANIN, et al.,

                     Defendants.
---------------------------------------------------X
DEARIE, District Judge.

        Defendant Adis Medunjanin awaits trial on numerous charges for allegedly conspiring with Najibullah Zazi and Zarein Ahmedzay to carry out coordinated suicide bombings in the New York City subway system on behalf of al-Qaeda.  Defendant moves to suppress the statements he made to law enforcement agents after he was arrested on January 7, 2010.  Defendant does not dispute that he signed three written waivers of his <u>Miranda</u> rights.  Instead, he argues that the statements were taken in violation of his Fifth Amendment right to counsel because he had implicitly invoked his right to counsel prior to his arrest.  In addition, defendant contends that the government's interference with his relationship with his attorney constituted a violation of his Fifth Amendment substantive due process rights and Sixth Amendment right to counsel.

        On March 7, 8 and 9, 2011, this Court held a suppression hearing during which the government called seven witnesses, including six law enforcement officials, and the defendant called five witnesses, including two law enforcement agents and defendant's father and sister.  Nine government exhibits and ten defense exhibits were also received into evidence.  In addition, defendant and his lawyer, Robert Gottlieb, each submitted an affidavit in support of the motion.

Defendant did not testify at the hearing.  Upon consideration of the parties' written submissions, including post-hearing supplemental briefs, and the hearing testimony and evidence, the Court denied the defendant's motion to suppress his post-arrest statements on September 8, 2011.  The Court's findings of fact and conclusions of law follow.

## I. FINDINGS OF FACT

A. Overview

The government's presentation is credible, convincing, and for the most part uncontroverted.  Defendant and his coconspirators, Najibullah Zazi and Zarein Ahmedzay, traveled to Peshawar, Pakistan at the end of August 2008, intending to fight with the Taliban against American forces in Afghanistan.  When their plans were thwarted, they instead trained at an al-Qaeda camp and were recruited to return to the United States to plot a coordinated suicide attack on the New York City subway system.  Defendant was targeted as a potential terrorist and became the subject of an ongoing investigation by the New York Joint Terrorism Task Force ("JTTF") comprised of Federal Bureau of Investigation ("FBI") agents and New York City Police Department ("NYPD") detectives.

On January 7, 2010, when agents seized defendant's passports and he realized that he likely would soon be arrested, defendant sought to commit a final act of jihad by crashing his car on the Whitestone Expressway in Queens, hoping to cause a spectacular explosion that would kill others.  As made plain by the recording of the 911 call that he made from his speeding car, he was committed to and prepared to die for the cause.  His attempt failed, however, and he was arrested at the scene after he intentionally collided with another car.  While defendant stood on the side of

2

the highway with an agent, waiting for the ambulance that police had called to arrive, he asked the agent whether he was Jewish and immediately began to lecture him on problems with Judaism. Thereafter, throughout the balance of the day and the next day, he knowingly and voluntarily waived his Miranda rights three times and gave detailed information to law enforcement about his trip to Pakistan with Zazi and Ahmedzay and his al-Qaeda training.  Defendant did not invoke his Sixth Amendment right to counsel until after he was indicted.

B. Defendant's Pre-Indictment Contact with JTTF

On September 14, 2009, JTTF agents executed multiple search warrants in Queens, New York, in pursuit of raw materials and plans for making improvised explosive devices.  One of the warrants was for the apartment where defendant lived with his parents.  During the search warrant execution, defendant agreed to speak with FBI Special Agent Farbod Azad and NYPD Detective Angel Maysonet of the JTTF. (Tr. 61.)  The agents drove him a short distance away from his residence to conduct the interview in order to avoid the distraction of the ongoing search. (Tr. 62.) The conversation with Agent Azad and Detective Maysonet took place entirely outside the car on the street, and defendant, free of restraint, could easily have walked home.

Defendant spoke with Agent Azad and Detective Maysonet for about two and a half hours. (Tr. 63, 151.)  The agents explained that the interview was completely voluntary, and that defendant was not under arrest.  The conversation was calm and flowing.  Defendant eagerly spoke about Islam, American-Israeli and American-Islamic relations and the 9/11 attacks on New York City.  He said that he had traveled to Pakistan with Zazi and Ahmedzay to find a wife but that the dowry was too high.  Defendant vouched for Zazi's character and said that Zazi and he

were very close and in touch with each other about once a month.  When the agents reminded defendant that they could check his phone records, however, he admitted that they spoke about fifteen times a month. (Tr. 65-67.)  Defendant initially agreed to take a lie detector test, but when the agents told him they could arrange for a test immediately, he declined, saying that he was not willing or ready. (Tr. 68.)  At the end of the interview, defendant agreed to speak with the agents again. (Tr. 68.)

A few days later, on September 17, 2009, defendant agreed to accompany Agent Azad and Detective Maysonet to the United States Attorney's Office in Brooklyn to be interviewed again. (Tr. 69, 153.)  The interview lasted approximately ten hours, with breaks for defendant to eat, use the bathroom and pray. (Tr. 70, 72, 155.)  Defendant went voluntarily and was not restrained at any time. (Tr. 70.)  He was again cooperative and spoke freely about religion, Islam, his background and how he became more religious, but he remained "defensive and evasive" when the discussion focused on his trip to Pakistan with Zazi and Ahmedzay.  (Tr. 73.) He denied that he had engaged in any kind of weapons training there (Gov. Ex. 2 at 4.), and reiterated that he had traveled to Pakistan for an arranged marriage to a relative of Zazi's, but the wedding did not take place because the dowry demanded was too high. (Tr. 72.)   Defendant signed a consent to search for a DNA swab, fingerprints, a voice exemplar and shoe prints, and when the interview ended, he agreed to speak with the agents again. (Tr. 75-76.)

Two days later, on September 19, 2009, Zazi was arrested. (Tr. 157.)  On September 25, 2009, defendant met with attorney Robert Gottlieb, and on September 28, 2009, retained Gottlieb to act as his attorney in connection with the investigation. (Tr. 361.)  Mr. Gottlieb notified Agent Azad and Assistant United States Attorney Jeffrey Knox that he was representing defendant and

4

asked that his client not be interviewed unless he was present. (Gottlieb Aff. dated 4/10/11 at ¶ 8-9; Tr. 140-41; 361; 409-10.)  The agents made no further attempts to question defendant. (Tr. 76-77).

Defendant and his family hoped that by retaining counsel, they could avoid further contact with law enforcement and limit press coverage of them. (Tr. 385-86.)  It did not, however, work out that way.  Agents spoke with defendant's father, and tried to speak to defendant's mother (Tr. 368-70), and agents continued to have contact with defendant's family members as they returned various items of personal property that had been seized on September 14, 2009, during their first visit to the Medunjanin home. (Tr. 162-63; 367-70; 379.)  Defendant's name also continued to appear in the press. (Tr. 386.)  By the end of December 2009, the initial $7,500 retainer paid to Mr. Gottlieb had been used up, and defendant's father paid an additional $520. (Tr. 363-65.)

C. Seizure of Defendant's Passports

On January 7, 2010, Agent Azad and Detective Maysonet executed a search warrant[1] at defendant's residence for the seizure of his United States and Bosnian passports. (Tr. 77.) Defendant asked Agent Azad whether his attorney had been contacted, and Azad replied that he had not and that defendant could do so if he wished. (Tr. 80.)  Defendant's sister, Alisa, who had been sleeping in another room after working a night shift, retrieved the passports, and defendant signed a receipt for them. (Tr. 82; 370.)  He was visibly shaken when Detective Maysonet asked

---

[1] In the affidavit supporting the warrant to seize defendant's passports, Agent Azad recited information received from a confidential informant who was in Pakistan in 2008 with defendant, Zazi and Ahmedzay, and who had made introductions on their behalf to assist the men in their efforts to attend an al-Qaeda training camp. (Tr. 78.)

whether he had signed his "true name" or "Muhammad," his al-Qaeda alias or *kunya*. (Tr. 83-84, 181; 416.)

As soon as the agents left, defendant tried to call Mr. Gottlieb. (Tr. 371.)  He was upset when he looked up the violations listed on the warrant on the internet and saw that one section referred to homicide. (Def. Ex. A & B, Tape 18265470.)  Mr. Gottlieb returned defendant's call at 2:24 p.m. and asked that he immediately email a copy of the search warrant and Agent Azad's business card. (Id.)  Mr. Gottlieb assured defendant that he would "check" the statutes listed on the warrant and call Agent Azad. (Tr. 371.)

When Mr. Gottlieb and Agent Azad spoke, Agent Azad confirmed that a search warrant had been executed and that defendant's passports had been seized. (Tr. 87, 184.)  Agent Azad referred Mr. Gottlieb to the United States Attorney's Office for additional information about the investigation. (Tr. 87, 185.)  Mr. Gottlieb was unable to reach AUSA Knox by telephone but left a message for him. (Gottlieb Aff. dated 12/6/10 at ¶ 12.)  AUSA Knox did not return Mr. Gottlieb's telephone call that day. (Id. at ¶ 24.)

D. Defendant's Attempted Final Act of Jihad

Alarmed by Detective Maysonet's use of his al-Qaeda *kunya* and by the seriousness of the charges listed on the search warrant, and anticipating his arrest, defendant decided to commit a final act of jihad.  Between 3:30 p.m. and 4:00 p.m. on January 7, 2010, just after his passports were seized, he set out to crash his car on the highway in an effort to create an explosion that would kill as many other people as possible.  Special Agent Theodore Roese, a member of the surveillance team since the beginning of December 2009, followed defendant from his house onto

the Whitestone Expressway.  Defendant was driving very fast, and Agent Roese had to drive 90 m.p.h. to keep up with him. (Tr. 215-16.)  Defendant wove in and out of traffic, crossed several lanes, and sped directly into another car. (Tr. 217.)  Before the collision, defendant called 911 and proclaimed "we love death [U/I] you love your life,"[2] and "*there is no God but Allah and Muhammed is His messenger.*"[3] (Tr. 102-04; 226-29; 374; Gov. Ex. 17-18.)

Immediately after the crash, defendant got out of his car and ran from the scene across the center median of the expressway. (Tr. 217, 230.)  Agent Roese stopped and handcuffed him, and Agent Aaron Spivack, another JTTF agent who had joined the pursuit, searched him. (Tr. 15, 21-22; 218-19, 233.)  Defendant was shaken and complained of elbow, shoulder and neck pain, but he was not seriously injured. (Tr. 16-17, 22, 32, 35; 218-20.)  When Agent Spivak first asked defendant how he was, he responded by asking whether Agent Spivak was Jewish.  (Tr, 19.)  When Agent Spivak said that he was, defendant proceeded to calmly lecture him about the problems with Judaism as a religion. (Tr. 20.)  Emergency Medical Services workers examined defendant, strapped him to a backboard, and loaded him into an ambulance. (Tr. 21; 221; 240.)  Detective Arnaldo Nunez of JTTF accompanied him in the ambulance to New York Hospital in Queens, New York, but he did not engage the defendant in substantive conversation. (Tr. 21; 240-41.)

Defendant arrived at the hospital around 5:15 p.m. and was examined by a triage nurse, the resident physician and the attending physician. (Tr. 261.)  A chest x-ray and CT scans of his

---

[2] The government asserts that the unintelligible portion of this phrase is "more than" and that "We love death more than you love life" is a common jihadist motto.

[3] The portion in italics is translated by the government from Arabic.  Defendant repeated this phrase four times to the 911 operator. See Gov. Ex. 18.

head and neck were negative. (Tr. 263.)   No medication was administered or prescribed. (Tr. 265.)

E. Defendant's First Miranda Waiver

Agent Azad, along with Detectives Michael Carney and Robert Murphy of JTTF, arrived at the hospital together and were joined there by Detective Maysonet. (Tr. 89.)  They confirmed with hospital staff that defendant was alert and had not been medicated. (Tr. 90; 279.)   He complained of some shoulder pain, but he recognized Agent Azad immediately and spoke fluidly. (Tr. 92; 281-82.)   Defendant's handcuffs were removed, Agent Azad introduced Detectives Carney and Murphy, and they shook hands with defendant. (Tr. 93; 281.)    Agent Azad acknowledged that defendant had an attorney but said that, even so, the agents "wanted to" or "were going to" speak with him if he were willing. (Tr. 93, 187; 283; 445-46.)  The agents talked with defendant for about fifteen minutes before administering Miranda warnings. (Tr. 92-93; 280-81, 316.)

Both Agent Azad and Detective Murphy told defendant that it was up to him to decide whether to talk to them, that he could "talk around" topics he did not want to discuss, and that he could stop at any time. (Tr. 96.)  Defendant told the agents that he wanted to fire his attorney because he was expensive and was not accomplishing anything for him. (Tr. 98, 189-90; 283, 303.)   Agent Azad and Detective Murphy explained that they could not advise defendant regarding his attorney. (Tr. 99; 283, 303.)  They agreed, however, that his lawyer was expensive. (Tr. 99; 197; 283, 303.)  Detective Murphy told the defendant that he was a father, and that as a parent, he would want to know the truth if one of his children were being investigated by the FBI

8

and would love his child regardless. (Tr. 94; 282, 317; 446-47.)   Although defendant seemed nervous, he was "inquisitive," the conversation was amicable, and defendant seemed relieved after speaking to the agents. (Tr. 282, 284.)

After defendant read and signed a <u>Miranda</u> waiver form, he was questioned by agents Azad, Carney, Murphy and Maysonet at the hospital from approximately 5:30 p.m. to 8:00 p.m. (Tr. 96-98, 199; 284-85.)  Defendant explained that he viewed himself as a prisoner of war who had been captured on a battlefield, and he asked whether he could be exchanged for a United States serviceman that had been captured by the Taliban. (Tr. 101; 286.)  He also explained that he realized he was going to be arrested and imprisoned for the rest of his life when the agents used his *kunya*, Muhammad.  Defendant then sought to commit a final act of jihad when he called 911, made his proclamation, and crashed his car, hoping to create an explosion that would kill other people. (Tr. 102; 287-88.)  He also admitted that he traveled to Pakistan with Zazi and Ahmedzay intending to fight with the Taliban in Afghanistan against the United States. (Tr. 106; 288-89.)

Defendant received discharge instructions at approximately 7:30 p.m. and left the hospital around 8:30 p.m. (Tr. 264; 267.)  The agents took defendant to the FBI office in Manhattan. (Tr. 110; 291; 333.)  They ordered in food and ate with him. (<u>Id.</u>)  Afterward, their discussion continued and returned to the topic of defendant's travel with Zazi to Pakistan.  Defendant discussed his failed attempt to enter Afghanistan to fight alongside the Taliban and subsequent religious and weapons training at an al-Qaeda camp. (Tr. 112-13; 294-95.)  He was calm and almost boastful as he explained the types of weapons he had been trained to fire. (Tr. 114.)  Although he became "defensive" and "evasive" when the agents asked about impending attacks in

the United States and any knowledge of, or involvement in, terrorist activity, defendant was otherwise cooperative and forthcoming. (Tr. 114.)  He seemed generally relieved and eager to talk. (Tr. 294.)  During the course of the interview, which continued into the early morning hours of the next day, January 8, 2010, defendant was given breaks to use the bathroom and the opportunity to eat and drink. (Tr. 115.)  At approximately 2:00 a.m., Special Agent Edward Panetta, who had prepared a series of photographs of individuals for defendant to identify, joined the interview. (Tr. 334.)  The atmosphere in the room was friendly, and defendant offered detailed answers to questions about the individuals in the photographs, including where he had met them, what he knew about them, their accents and the food that they liked. (Tr. 335.)

F. Mr. Gottlieb's Attempts to Locate Defendant

During this time, defendant's family and Mr. Gottlieb endeavored to locate him. It was unusual for him to go out without telling his family, but he had left while his sister, Alisa, was sleeping and no one knew where he had gone. (Tr. 372.) At approximately 9:30 p.m., a member of the press told Mr. Gottlieb that defendant had been taken to New York Hospital in Queens. (Tr. 373, 400; Gottlieb Aff. dated 12/6/10 at ¶ 13; Def. Ex. A & B, Tape 18269006.)  Mr. Gottlieb called Alisa, and Alisa called the emergency room. (Tr. 373; Def. Ex. A & B, Tape 18269006, 18269022 & 18269043.)  She was told that defendant was not there.  (Def. Ex. A & B, Tape 18269043.)  Nonetheless, Mr. Gottlieb arranged to meet defendant's family at the hospital. (Tr. 373-74; Gottlieb Aff. dated 12/6/10 at ¶ 14.)  The nurse who treated defendant told Mr. Gottlieb that defendant had been discharged into the custody of officers from the 109th precinct. (Gottlieb Aff. dated 12/6/10 at ¶ 16.)

At the precinct, Mr. Gottlieb informed the desk officer that he was defendant's lawyer and did not want defendant to be questioned. (Id. at ¶ 17.)  Defendant, however, was not there. (Id. at ¶ 18.)  Mr. Gottlieb was told that defendant was in the custody of the JTTF.  At 9:55 p.m., Mr. Gottlieb instructed an associate at his firm to place a number of calls to law enforcement in an effort to locate defendant and prevent police questioning. (Tr. 430; Gottlieb Aff. dated 12/6/10 at ¶ 21.)  Between 10:00 p.m. and midnight that night and between 6:00 a.m. and 8:00 a.m. the following day, January 8, 2010, Gottlieb's associate called Agent Azad's office phone number, the FBI main number, N.Y.P.D. Intel and Mr. Gottlieb several times, but was unable to find out where defendant was. (Tr. 431-39.)

G. Defendant's Second <u>Miranda</u> Waiver

Around 2:00 a.m. on the morning of January 8, 2010, defendant was presented with a Waiver of Speedy Arraignment form indicating that he was being charged with receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D. (Tr. 117-18; 200-01.) He was told that he could either agree to continue the interview, in which case he would stay in the FBI office, or he could choose to end the interview, in which case he would be brought to the detention center and arraigned later that day. (Id.)  Defendant agreed to continue and signed the form waiving his right to a speedy arraignment and waiving his <u>Miranda</u> rights for a second time. (Tr. 118-19; 296-97.)  In addition, defendant signed a consent to search form with respect to his cellular phone. (Tr. 119; 296.)  He was allowed to make ablutions and pray, and the agents left. (Tr. 120.)  Agent Panetta provided bedding for the defendant, but defendant told him that he was not ready to go to sleep and wanted to keep talking. (Tr. 338.)  They discussed Agent Panetta's

11

military service as compared with defendant's experiences in Pakistan and other topics including religion. (Tr. 339-41.)   After approximately 45 minutes to one hour, Agent Panetta ended the discussion so that defendant could sleep. (Tr. 338, 341.)

Mr. Gottlieb phoned AUSA Knox again on the morning of January 8, 2010.  Several hours later, AUSA Knox returned the call and told him that defendant would be arraigned that afternoon but that defendant no longer wanted Mr. Gottlieb to represent him. (Gottlieb Aff. dated 12/6/10 at ¶ 24.)  He refused to disclose defendant's whereabouts. (Id.)  When the two spoke again about the timing of the arraignment, AUSA Knox asked Mr. Gottlieb to appear at the arraignment to "straighten out" the issue of defendant's representation. (Id. at ¶ 25.)

H. Defendant's Third <u>Miranda</u> Waiver

Defendant was taken to the FBI office at 26 Federal Plaza for processing. (Tr. 121; 298.) He read and signed a third FBI <u>Miranda</u> waiver form around 12:20 p.m. on January 8, 2010, (Tr. 121-22), and agents Azad and Carney continued to speak with him for approximately two hours. (Tr. 123; 299-300.)  They discussed defendant's al-Qaeda training, the people he had met at the camp, and al-Qaeda's solicitation of him to martyr himself by becoming a suicide bomber. (Tr. 124; 299.)  He explained that he did not want to be a suicide bomber, but that he offered to return to the United States to raise money to send to al-Qaeda and to encourage others to attend the training camp. (Tr. 124.)  Sometime between 3:00 p.m. and 4:00 p.m., Agent Panetta showed defendant additional photographs and questioned him for about an hour. (Tr. 343.)  The interview ended when Agent Azad indicated that defendant needed to appear in court. (Tr. 343-44.)   AUSA

Knox called Mr. Gottlieb to request that he come to the courthouse for defendant's arraignment. (Gottlieb Aff. dated 12/6/10 at ¶ 26.)

I. Defendant's Indictment

From the time questioning began at the hospital through the end of the interviews on January 8, 2010, defendant did not request to speak with Mr. Gottlieb, or any other lawyer, at any time, nor did he ask to end the interrogation. (Tr. 107, 115, 125; 297.)  It was only after defendant was advised that, in addition to the charge of receiving military-type training from al-Qaeda, a grand jury had returned an indictment against him for conspiring to commit murder abroad, in violation of 18 U.S.C. § 956(a), that defendant invoked his right to counsel. (Tr. 127-28.) Defendant was presented with a second waiver of speedy arraignment form by Detectives Maysonet and Murphy that included the following notification: "I have been advised that my attorney Robert Gottlieb has requested to speak with me," with space for check marks to indicate whether he wanted to speak to Mr. Gottlieb. (Tr. 127-29; 300; 329.)  Defendant reviewed the form and said that he disagreed with the conspiracy to commit murder charge. (Tr. 128-29; 301.) He indicated by a check mark on the waiver form that he did want to speak to Mr. Gottlieb, and the agents then terminated their questioning. (Tr. 129-30; 301; 344.)

Mr. Gottlieb received another call from AUSA Knox informing him that the arraignment would not take place that evening but would instead be held the following day. (Gottlieb Aff. dated 12/6/10 at ¶ 29.)  Mr. Gottlieb met with defendant the next morning before his arraignment. (Id. at ¶ 30.)

## II. DISCUSSION

A. Overview

Defendant moves to suppress all of the statements he made to law enforcement officers on January 7 and January 8, 2010.  First, defendant argues that his call to his attorney after his passports were seized served as an invocation of his Fifth Amendment right to counsel and that the agents' subsequent questioning of him, therefore, violated Edwards v. Arizona, 451 U.S. 477, 485 (1981).  Defendant also argues that his three Miranda waivers were not voluntary and knowing because the agents manipulated him into believing his family would benefit from his waiver and failed to inform him that his attorney wanted to speak to him while he was being interrogated.  Finally, defendant argues that government attempts to convince him, both directly and through his parents, not to incur the expense of an attorney, and the government's efforts to prevent his attorney from locating him after his arrest, constituted improper interference that violated both his Sixth Amendment right to counsel and Fifth Amendment right to due process.

B. Defendant Did Not Invoke Right to Counsel Prior to High-Speed Chase

It is well-settled that the Fifth Amendment right to counsel applies when a defendant is subject to custodial interrogation.  See Miranda v. Arizona, 384 U.S. 436, 469-70 (1966) ("The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . .  Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.").   Once the right to counsel is invoked,  Miranda requires that "the interrogation must

14

cease until an attorney is present," Miranda, 348 U.S. at 474, and under Edwards, a subsequent waiver of this right to counsel "cannot be established by showing only that [the defendant] responded to further police-initiated custodial interrogation." 451 U.S. at 484-85. Rather, no questioning is allowed "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 485.  As recently reiterated by the Supreme Court in Maryland v. Shatzer, "the rationale of Edwards is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect.'" 130 S. Ct. 1213, 1219 (2010) (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988)).

Miranda does not apply, however, "[i]f the defendant is not in custody. . . nor do[es] [it] govern other noninterrogative types of interactions between the defendant and the State." Montejo v. Louisiana, 129 S. Ct. 2079, 2090 (2009).  Furthermore, because the specific protections provided under Miranda and Edwards are not required by the Constitution, but are prophylactic rules designed to safeguard an accused's Fifth Amendment right against compulsory self-incrimination, see Davis v. United States, 512 U.S. 452, 458-59 (1994), expansion of these rules must be balanced against the societal interest in legitimate investigative activity and effective law enforcement. See Montejo, 129 S. Ct. at 2089; Shatzer, 130 S. Ct. at 1220.  "The 'ready ability to obtain uncoerced confessions is not an evil but an unmitigated good.'" Montejo, 129 S. Ct. at 2091 (quoting McNeil v. Wisconsin, 501 U.S. 171, 181 (1991)).

It is undisputed that defendant was *not* in custody on January 7, 2010, when he phoned counsel from his home.  Nonetheless, defendant contends that in the context of his counsel's prior notice to the government that defendant was represented, defendant and counsel's readily apparent attorney-client relationship, and the government's ongoing surveillance of defendant, defendant effectively invoked his Fifth Amendment right to counsel by contacting Mr. Gottlieb after the seizure of his passports.  According to defendant, Mr. Gottlieb then "closed this loop" by calling Agent Azad and Mr. Knox, making it clear that defendant wanted counsel as a buffer between himself and the government. (Def. Brief at 27; Reply at 4.)  Defendant argues, therefore, that the interrogation initiated by the police after the car crash on the Whitestone Expressway violated Edwards.  To find that defendant's phone call to counsel constituted an invocation of his Fifth Amendment right to counsel, however, would be an unjustified expansion of Miranda.

This novel theory suffers from a number of fatal flaws.  First and foremost, the Supreme Court has never recognized an anticipatory invocation of Miranda rights by a defendant "in a context other than 'custodial interrogation.'"  See Montejo, 129 S. Ct. at 2091 (citing McNeil, 501 U.S. at 182 n.3). Indeed, the Supreme Court's recent analysis of Miranda and Edwards in Montejo makes clear that even post-indictment requests for counsel under the Sixth Amendment have no bearing on the propriety of later custodial interrogation under the Fifth Amendment.  Montejo overruled Michigan v. Jackson, 475 U.S. 625 (1986), thus eliminating Jackson's prophylactic rule that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation [on that charge] is invalid." Montejo, 129 S. Ct. at 2083 (quoting Jackson, 475 U.S. at 636); see also McNeil, 501 U.S. at 180 (holding that Jackson precludes interrogation

with respect to the charge for which defendant has asserted his Sixth Amendment right to counsel's assistance).  In so doing, the Court clarified that "[w]hat matters for Miranda and Edwards is what happens when the defendant is approached for interrogation," and not what happens before. Montejo, 129 S. Ct. at 2091. Similarly, in this case, nothing defendant said or did in advance of his being taken into custody, including his call to Mr. Gottlieb after his passports were seized, could have brought the Edwards rule into play. During the course of the investigation and prior to his indictment on charges including conspiracy to commit murder abroad, each time defendant had contact with law enforcement agents, both before and after he engaged counsel to represent him, he was willing and seemingly eager to speak with them.  Indeed, within minutes after his high-speed collision on the expressway, defendant asked Agent Spivak if he was Jewish and calmly proceeded to lecture him on the problems with Judaism and relative merits of Islam.

Moreover, even if there were a legal basis for recognizing a pre-custodial invocation of the Fifth Amendment right to counsel, defendant's actions and statements did not constitute an invocation as a factual matter.  As expressed by the Supreme Court in McNeil, "the *likelihood* that a suspect would wish counsel to be present is not the test for applicability of Edwards. . . . It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." 501 U.S. at 178 (emphasis in original).  The Supreme Court has explicitly refused to add an additional "layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer." Davis, 512 U.S. at 462 (emphasis in original). Questioning, therefore, may continue unless the suspect actually requests a lawyer, and that request must be unambiguous. See id.; see also Berghuis v. Thompkins, 130 S.Ct. 2250, 2260 (2010) (quoting Moran v. Burbine, 475 U.S. 412,

17

425, 427 (1986)) ("Treating an ambiguous or equivocal act, omission, or statement as an invocation of <u>Miranda</u> rights 'might add marginally to <u>Miranda</u>'s goal of dispelling the compulsion inherent in custodial interrogation.'  But 'as <u>Miranda</u> holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.'").  Rejecting as insufficient an accused's remark of "Maybe I should talk to a lawyer," the Supreme Court explained: "[W]hen the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the <u>Miranda</u> safeguards into wholly irrational obstacles to legitimate police investigative activity because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." <u>Davis</u>, 512 U.S. at 460 (internal citation and quotations omitted).

In this case, defendant Medunjanin did not request the presence of a lawyer when the search warrant was executed.  He merely questioned whether his lawyer had been notified of the warrant.  Defendant was told by the agents that he could contact his lawyer if he wanted, but defendant did not do so until the agents left with his passports.  When he did, his conversation was limited to the contours of the search warrant and the statutes listed therein.  Similarly, Mr. Gottlieb's call to Agent Azad and message for Mr. Knox concerned the execution of the warrant and in any case, did not express *defendant's* desire for an attorney to be present during any questioning.  Thus, whether legally available to him or not, defendant did not make an unambiguous invocation of his Fifth Amendment right to counsel for the specific purpose of "*dealing with* [the] *custodial interrogation by the police*." <u>McNeil</u>, 501 U.S. at 178 (emphasis in original). Under <u>Miranda</u> and <u>Edwards</u>, "a defendant who does not want to speak to the police

without counsel present need only say as much when he is first approached and given the <u>Miranda</u> warnings." <u>Montejo</u>, 129 S.Ct. at 2090.  This defendant did not do so until the afternoon of January 8, 2010, after he was indicted by a grand jury of conspiring to commit murder abroad and receiving al-Qaeda training, and when he did, he did so clearly and without hesitation.

C. Defendant's <u>Miranda</u> Waivers Were Knowing and Voluntary

Once defendant was handcuffed at the scene of the car crash on the Whitestone Expressway, defendant was, of course, in custody and the statements he made during the ensuing discussions and interviews were the product of custodial interrogation.   Nonetheless, the statements are admissible because defendant was given <u>Miranda</u> warnings and voluntarily, knowingly and repeatedly waived his Fifth Amendment rights.

A <u>Miranda</u> waiver is made "knowingly" provided it is made with an understanding of Fifth Amendment rights and the consequences of waiving them. <u>Burbine</u>, 475 U.S. at 421.  A waiver is "voluntary" if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Id.</u>  Consideration is given to the totality of the circumstances. <u>Parsad v. Greiner</u>, 337 F.3d 175, 183 (2d Cir. 2003); <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).  Thus, the determination of voluntariness turns on the characteristics of defendant, as well as the conditions of interrogation and the conduct of the police. <u>Parsad</u>, 337 F.3d at 183; <u>Anderson</u>, 929 F.2d at 99.   Nevertheless, "moral and psychological pressures to confess emanating from sources other than official coercion" are not a concern. <u>Thompkins</u>, 130 S. Ct. at 2263 (quoting <u>Oregon v. Elstad</u>, 470 U.S. 298, 305 (1985)) (questioning police officer's reference to defendant's religious beliefs did not render statement involuntary).

Defendant initially asserted that his <u>Miranda</u> waivers were involuntary because the agents threatened to arrest and prosecute his family if he did not cooperate.  (Medunjanin Aff. at ¶ 19-21.)  At the hearing, however, Agents Azad, Carney and Panetta each testified that no threat to arrest or prosecute defendant's family members was ever made (Tr. 94; 283-84; 344), and in his post-hearing brief, defendant abandons this claim.  Instead, defendant now argues that his <u>Miranda</u> waivers were involuntary because he was manipulated by Detective Murphy into believing that he should give up his rights out of some generic obligation to his family.  Defendant also contends that his <u>Miranda</u> waivers were involuntary because the agents repeatedly raised the issue of the expense of retaining an attorney.  Lastly, defendant contends that his <u>Miranda</u> waivers were not made "knowingly" because he was not informed of Mr. Gottlieb's attempts to contact him. None of these claims is supported by the facts or the law.

Agent Azad, Detective Carney, and Detective Murphy each testified that Detective Murphy explained to defendant that, as a parent, Murphy would want to know the truth if one of his children were being investigated by the FBI. (Tr. 94; 282; 317; 446-47.)   None of them testified, however, that Detective Murphy advised defendant to waive his rights because his family wanted or needed him to.  Moreover, although defendant asserts that the agents' ongoing discussion of attorney costs was somehow coercive, the bulk of the conversations defense counsel cites in support of this claim occurred with members of *defendant's family*—not defendant—months before defendant's arrest.  In addition, there is no evidence to support defendant's contention that the conversation at the hospital about attorney expense was coercive.  To the contrary, the evidence in the record is entirely consistent with the agents' testimony that defendant said he wanted to fire his attorney because his attorney was expensive and had not

20

accomplished anything.  Indeed, the retainer fee that defendant had paid was exhausted even before his arrest. (Tr. 365.)  It was the defendant who initiated discussions about counsel, including his complaint about fees, which he perceived as unjustified.

Considering the totality of the circumstances, defendant's claim that his waiver was coerced fails.  "Regardless of whether [an] agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances—considering [the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials]—the defendant's will was overborne by the agent's conduct." Anderson, 929 F.2d at 99.  Here, overwhelming evidence in the record supports the finding that defendant's will was not overborne. Each of the law enforcement officers who interacted with or questioned defendant, whether before he was taken into custody or after, indicated that defendant was eager to speak, repeatedly engaging in discussions of religion and politics at his own initiation. The record reflects that the atmosphere of the interrogations remained friendly and open, each of the agents established a good rapport with defendant, and defendant was given sufficient breaks to attend to his personal and religious needs.  Defendant remained consistently evasive about only one subject — his knowledge of planned attacks in the United States.  See United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996) (fact that defendant answered some questions and chose not to answer others indicates voluntarily waiver of rights). Accordingly, the Court concludes that defendant's waivers were voluntary.

Defendant also contends that his Miranda waivers were not made "knowingly" because he was not informed of Mr. Gottlieb's efforts to speak to him during the time he was being interrogated.  Moran v. Burbine, however, squarely forecloses this argument.  475 U.S. 412.  In

21

Burbine, the defendant's sister retained counsel for him while he was in custody. Id. at 416.  The

defendant's counsel then contacted the police to inform them the defendant was represented and

was told that her client would not be questioned that evening. Id. at 417.  The defendant, however,

was interrogated and confessed. Id. at 417-18. The Supreme Court nonetheless found his waiver

valid on the ground that:

> Events occurring outside of the presence of the suspect and entirely unknown to
> him surely can have no bearing on the capacity to comprehend and knowingly
> relinquish a constitutional right . . . . No doubt the additional information would
> have been useful to respondent; perhaps even it might have affected his decision to
> confess. But we have never read the Constitution to require that the police supply a
> suspect with a flow of information to help him calibrate his self-interest in
> deciding whether to speak or stand by his rights.  Once it is determined that a
> suspect's decision not to rely on his rights was uncoerced, that he at all times knew
> he could stand mute and request a lawyer, and that he was aware of the State's
> intention to use his statements to secure a conviction, the analysis is complete and
> the waiver is valid as a matter of law.

Id. at 422-23 (internal citations omitted).  The Court further found that "whether intentional or

inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and

voluntariness of respondent's election to abandon his rights." Id. at 423.  The same reasoning

applies in this case to foreclose defendant's argument that his waiver was not "knowing."

This Court also rejects defendant's suggestion that the existence of an ongoing attorney-

client relationship somehow renders a Fifth Amendment Miranda waiver inherently suspect and

presumptively involuntary.   The Supreme Court's rationale in Montejo for eliminating the

Jackson rule is again instructive.  The Court explained that under Jackson, an invocation of a

defendant's Sixth Amendment right to counsel rendered any subsequent Miranda waiver invalid

"based on the supposition that suspects who assert their right to counsel are unlikely to waive that

right voluntarily in subsequent interactions with police." Montejo, 129 S. Ct. at 2086 (internal

22

quotations and citation omitted).  The <u>Jackson</u> rule thus operated not only "to invalidate a confession given by the free choice of suspects who have received proper advice of their <u>Miranda</u> rights but waived them nonetheless," but also to "deter[] law enforcement officers from even trying to obtain voluntary confessions." <u>Id.</u> at 2090-91 (internal quotations and citation omitted). Weighing the "marginal benefits of the <u>Jackson</u> rule . . . against its substantial costs to the truth-seeking process and the criminal justice system," the Supreme Court concluded that <u>Jackson</u> should be discarded because it did not "pay its way." <u>Id.</u> at 2091.  In so rejecting <u>Jackson</u>, <u>Montejo</u> made clear that the prophylactic rules of <u>Miranda</u> and <u>Edwards</u> sufficiently protect a defendant's Fifth Amendment rights.  <u>Jackson</u>'s since-abandoned presumption that a defendant who has elected representation would not later choose to waive it voluntarily will not be resurrected and applied here.

### D. Government "Interference" Did Not Violate Fifth or Sixth Amendments

Finally, citing <u>United States v. Stein</u>, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), <u>aff'd</u>, 541 F.3d 130 (2d Cir. 2008), defendant contends that the government's efforts to interfere with his relationship with his retained counsel violated his Fifth Amendment substantive due process rights and Sixth Amendment right to counsel.  Defendant's assertions of outrageous government conduct, required for finding a due process violation, however, are entirely unfounded, and there is no similarity between <u>Stein</u> and the facts of this case.

In <u>Stein</u>, the Second Circuit ruled that the government violated corporate defendants' Sixth Amendment rights to counsel by pressuring their employer to place conditions on the advancement of legal fees for their defense, cap the fees and terminate payments. 541 F.3d at 157-

58.  In contrast, the government's conduct in this case prior to January 7 and 8, 2010 falls far short of any kind of serious interference with defendant's right to counsel.  Indeed, the most significant visits the agents made to defendant's parents in an effort to persuade them to encourage defendant's cooperation occurred at the end of September and beginning of October 2009, months before the events surrounding defendant's arrest and indictment, and did not affect his continued retention of counsel.  Furthermore, once defendant retained Mr. Gottlieb, no law enforcement agents approached him for questioning until his desperate attempt to wage jihad at high speed on the Whitestone Expressway.  Moreover, overwhelming evidence in the record supports the finding that it was primarily defendant's own actions, not the government's, that made it difficult for counsel to locate him on January 7 and 8, 2010.  Defendant, unbeknownst to his family and Mr. Gottlieb, set out to commit mayhem.  Through no fault of the government, his family and Mr. Gottlieb were completely unaware of any of his actions or whereabouts for several hours after he was taken into custody and waived his rights.

That the government's conduct may have been opportunistic does not even suggest that their conduct was "outrageous."  Far to the contrary.  The government had a suspect in their sights who they had significant reason to believe was involved in a conspiracy to commit mass murder of citizens of the United States.  To have done as the defense suggests—i.e. turn a deaf ear while a self-declared prisoner of war eagerly talks about his exploits and intentions—would have been nothing short of derelict and absurd.  The Constitution does not require such restraint and common sense forbids it.  Neither the Fifth nor Sixth Amendments requires the government to muzzle a talkative suspect merely because agents may be aware that the songbird is represented by counsel.

### III. CONCLUSION

The defense arguments are unsupported by precedents or evolving case law.  On the facts defendant fares no better.  It is clear beyond doubt that defendant was eager to speak.  Indeed his exhortation began before he was confronted by the agents at the crash scene when he announced his purpose on the 911 call.  His eagerness continued throughout the day and evening and into the early morning hours of the next day when he preferred to talk rather than sleep.  There is no contention that he did not understand his rights, which he waived without hesitation or inquiry.  He also knew how to say "no" and ask for an attorney when presented with the second waiver of speedy arraignment and the specter of more serious charges.  While the agents and officers meeting with him may have been deft in encouraging his openness, there is no credible evidence that they took steps that are constitutionally proscribed.

For the reasons set forth above, defendant's motion to suppress the statements he made to law enforcement officers on January 7 and 8, 2010, is denied.  Nothing in the government's classified disclosure of May 23, 2011, alters this Court's findings or conclusions.  Accordingly, defendant's request for a status conference regarding the implications of the disclosure is denied.

SO ORDERED.

Dated: Brooklyn, New York
March 28, 2012


_____/S/_____

RAYMOND J. DEARIE
United States District Judge

25