# H2H Films

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ AUG 04 2015 ★

BROOKLYN OFFICE

July 31, 2015

The Honorable John Gleeson
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Adis Medunjanin**
Case Number: 1:10-cr-00019

Dear Judge Gleeson:

I am an investigative reporter for H2H Films, a documentary production company based in New York.

I am writing to request access to a copy of an audio recording of the deposition of Saajid Badat in the above-referenced case.

A video recording of the deposition was played for the jury in the case on April 19 and 23, 2012.

During the trial, you stated on the record that the media would be provided with any exhibits received in evidence unless either the government or the defendant successfully moved for an order precluding such access.

In a letter to you dated April 25, 2012, the United States Attorney opposed the release of the video recording of Badat's deposition to the media, but noted that it "has no objection to the release of an audiotape of the deposition." I have attached a copy of the letter.

Indeed, at least some of the audio recording has since been released to the media – see for example the portions of the recording that were used in the April 30, 2012 CBS News story at this link:

http://www.cbsnews.com/news/american-al-qaeda-offering-insights-at-nyc-trial/

(I have also attached a file containing the audio of the CBS News story.)

Finally, a full transcript of the deposition was made available to the media after Badat's testimony was presented. It is Government Exhibit 450T in the case, and again I have attached a copy.

In these circumstances, we do not believe that there is any basis for declining to provide us with access to the audio recording in its entirety. We believe that the American public has the right to hear the audio recordings of Badat's testimony for itself.

We would be grateful for your decision on this request at your earliest convenience. If you have any questions or require any additional information, please feel free to contact me at any time on (646) 894-8109.

Thank you very much for your time and consideration.

Sincerely,

*Andrea Hilbert*

Andrea Hilbert
Investigative Reporter, H2H Films for PBS
(646) 894-8109
andrea.hilbert1@gmail.com
101 West 24th Street, Apt 33E
New York, NY 10011



*United States Attorney*
*Eastern District of New York*

DMB:BWB/JPL/ZA
F.#2010R00057

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 25, 2012

The Honorable John Gleeson
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Adis Medunjanin
     <u>Criminal Docket No. 10-19 (S-4)(JG)</u>

Dear Judge Gleeson:

  The government respectfully submits this letter in response to media requests for a copy of the digital-video disc of the deposition of Saajid Badat, which was played to the jury in the above-referenced case on April 19 and 23, 2012. A full transcript of the video has already been made available to the media.

  The government opposes the release of the video to the media on two primary grounds. Firstly, the worldwide broadcasting of Badat's current physical appearance, which differs significantly from his appearance upon arrest and in his widely-circulated arrest photographs, would create a significant risk to his safety. Secondly, and relatedly, if the United States is unable to protect the safety of foreign witnesses who are testifying in our courts by sole virtue of their host nation's cooperation with the U.S., our government would be significantly impeded in securing similar cooperation in the future. Such cooperation is essential to convicting defendants accused of crimes of international terrorism in Article III courts, and thereby essential to national security.

  As explained further below, the government respectfully submits that the requests for copies of the video should be denied. The government has no objection to the release of an audiotape of the deposition.

I. <u>Background</u>

    A.   <u>Badat's Testimony</u>

On March 29, 2012, pursuant to a government motion under Federal Rule of Criminal Procedure 15, the parties conducted the deposition in London of Saajid Badat, who had been convicted in the United Kingdom of offenses related to an al-Qaeda plot to attack civil aircraft in November 2001. Badat has also been charged in the District of Massachusetts with similar crimes; those charges remain pending.

Badat's cooperation with the British authorities had heretofore been classified under British law, and unknown to the public. In response to the United States government's request to obtain Badat's testimony in this matter, the British authorities provided the government with materials in both classified and unclassified form for provision to the defendant pursuant to the Jencks Act, 18 U.S.C. § 3500, and <u>Giglio v. United States</u>, 405 U.S. 190 (1972).

Badat's deposition testimony was the subject of widespread media attention beginning with opening statements on April 16, 2012. The playing of the deposition video was widely attended and reported on in the British and American press. After the conclusion of the presentation of his testimony, its entire transcript was made available to the media.

    B.   <u>The Risks to Badat's Safety</u>

Badat was released from prison in the United Kingdom in February 2010, where he continues to live. He has received protection from the British police since his release because of strong concerns about his physical safety.[1]

Badat's appearance has changed substantially since the time of his arrest and incarceration. All publicly-available photographs of him were taken in the period prior to his incarceration. The change in his appearance is sufficiently dramatic that, despite the fact that he has been living out of custody in the United Kingdom for approximately two years, his release was not publicly reported prior to his testimony in this

---

[1] The British authorities are preparing a letter to the Department of Justice describing their strong security concerns about the release of Badat's image to the public. The government will provide that letter to the Court as soon as it receives it.

2

case.

The risks to Badat's safety stem not only from his testimony in this trial, but relate also to his expected testimony in several important future international terrorism trials. Based on Badat's lengthy experience in Afghanistan interacting with senior members of al-Qaeda, he is in a unique position to provide significant evidence in an array of terrorism cases of substantial interest to the United States.

II. Applicable Law

"While the existence of the common law right to inspect and copy judicial records is beyond dispute, it is equally clear that that right is not absolute." United States v. Graham, 257 F.3d 143 (2d Cir. 2001) (internal quotation marks and citations omitted). The Second Circuit has held that there is a "'strong presumption' in favor of allowing the public to inspect and copy any item entered into evidence at a public session of a trial." Id. (quoting In re Application of NBC ("Myers"), 635 F.2d 945, 952 (2d Cir. 1980)). The Court has reasoned that "once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." Id. (quoting Myers, 635 F.2d at 952) (internal quotation marks omitted). "[T]he decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon v. Warner Communications, 435 U.S. 589, 599 (1978).

In In re Application of CBS ("Salerno"), 828 F.2d 958 (2d Cir. 1987), the Court found that there was no general exception to the common law right of access for videotaped Rule 15 depositions. Id. at 959-60. In response to the government's argument that the witness's frail appearance in the videotape could cause him embarrassment, the Court held that "the privacy interests of the ill witness" were insufficiently compelling to overcome the presumption of access because "[o]ld age and ill health are neither uncommon nor generally a cause of severe embarrassment." Id. at 960-61. Generally speaking, however, the Second Circuit has recognized "that the common law right of access is qualified by recognition of the privacy rights of the persons whose intimate relations may thereby be disclosed." In re Application of Newsday, Inc., 895 F.2d 74, 79 (2d Cir. 1990).

3

In the analogous First Amendment right of access context, the Circuit has approved limitations on public disclosure to protect compelling interests including the physical safety of defendants, witnesses, or others. See, e.g., In re Herald Co., 734 F.2d 93, 100 (2d Cir. 1984) (closure "should be invoked only upon a showing of a significant risk of . . . [for example] danger to persons [or] property"); see also United States v. Doe, 63 F.3d 121, 127 & n.2 (2d Cir. 1995) ("Prior to In re Herald, we had found at least partial closure to be necessary to prevent exposure of testimony that might provoke retaliation against witnesses or defendants."); United States ex rel. Lloyd v. Vincent, 520 F.2d 1272, 1274-75 (2d Cir.) (closure of trial during testimony of undercover narcotics agent) (cited in Doe, supra); United States ex. rel. Bruno v. Herold, 408 F.2d 125, 127-29 (2d Cir. 1969) (closure of trial to prevent witness intimidation) (cited in Doe, supra).

In Doe, the Circuit specifically observed that protection of "a person's physical safety" could justify sealing:

> The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations, such as the one in which Doe allegedly participated.

Doe, 63 F.3d at 127, 130. The Doe Court thus held that to justify closure, there was no need for evidence of a "direct threat," but rather that "the record must support an inference of a substantial probability of danger." Id. at 129-30. See also United States v. Arroyo-Angulo, 580 F.2d 1137, 1142-43 (2d Cir. 1978) (in camera proceedings justified to protect safety of cooperating witnesses).

Finally, the Circuit has held that national security interests can, in appropriate circumstances, outweigh the public's right of access to Court proceedings. See United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) ("[T]ransparency must at times yield to more compelling interests. It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.").

III. Discussion

While the general right of access of the media to documents or physical items used in criminal prosecutions is beyond dispute, the relatively minor quantum of additional information that would be provided by disclosing the video of the

4

deposition in addition to the transcript and audiotape cannot outweigh the witness's, and the American and British governments', interests in his safety. See generally Warner Communications, 435 U.S. at 602 (balancing "incremental gain in public understanding" to be achieved by release of audiotapes in addition to transcripts against petitioner's right to privacy in deciding whether common-law right of access required release).

### A. The Witness's Safety Interest

The risks to Badat's physical safety of the widespread release of a video depicting his current physical appearance are severe, and thus sufficiently compelling to outweigh the marginal benefit to the public of being able to see, rather than read, his testimony. As the Second Circuit has noted, "[t]here can be little doubt that in some instances, the safety of a witness will certainly be an overriding interest." Woods v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1992) (internal quotations and alterations omitted).

As an initial matter, the facts that (1) the witness's testimony was open for the public and media to observe firsthand and (2) the transcript of that testimony was made available to the media, put the media's access to this witness at the same level as its access to every other witness who testifies in federal court on a daily basis. Photographing and broadcasting proceedings in a federal courtroom are expressly prohibited by the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 53 ("Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."). Indeed, since the government has no objection to the release of the audiotape of the deposition, the public will have greater access to Badat's testimony than it does to the testimony of most witnesses at federal criminal trials.

Had Badat testified live in open court, there would have been no further opportunity to observe his testimony beyond the trial transcript. Id. Indeed, had he testified by live video-link from the United Kingdom, there would similarly have been no recording available for disclosure. Only because the deposition was video-recorded prior to trial is there even a possibility of further disclosure. There can therefore be little question that the level of access the media typically enjoys to witness testimony in federal trials has been accorded in this case, and therefore that the incremental gain to the public's understanding of the proceedings that would result from releasing

5

the videotape is minimal.

Viewed against this backdrop, the extraordinary risks to the witness's safety posed by public disclosure of the video more than sufficiently outweigh the public's right to inspect and copy the videotaped testimony. See United States v. Hickey, 767 F.2d 705, 709 (10th Cir. 1985) (holding that threat to witness's "future safety" was sufficiently compelling to override common law right of access where defendant sought access to witness's plea agreement containing information about his status in witness protection program). It is difficult to imagine circumstances more "compelling," under the Myers framework, than protecting a witness from retaliation by a violent international terrorist organization or its sympathizers. Badat's interactions with al-Qaeda put him in the unique position of being able to contribute to the convictions of that organization's most senior leaders and to publicly reveal its most sensitive operational plans and capabilities.[2] There is little reason to believe that al-Qaeda will be reluctant to react to this threat against its members and existence with the extreme violence that has become its trademark. See, e.g., Doe, 63 F.3d at 130 ("The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations.").

Should the video-recording of the deposition be released, it will, as a matter of certainty, be uploaded by media organizations to the internet.[3] It will then be permanently available to anyone, anywhere in the world, with an internet connection. The witness's current appearance will thus be available – again, as a matter of certainty – to anyone who wishes to harm him in retaliation for his current testimony, or to prevent his future testimony. It by no means erodes the Second Circuit's "strong presumption" of access articulated in Graham and Salerno to observe that those cases were decided based on different factual premises, in the face of different countervailing interests. Where witness harm is, as a factual

---

[2] The government can provide additional information regarding the future trials in which Badat is expected to be called as a witness via sealed addendum, should the Court require it.

[3] Exhibits provided by the government to the media in this trial have already been uploaded to YouTube, and printed in news articles available on the internet. See, e.g., GX 117L-1 (Interview of Zazi), available at http://www.youtube.com/watch?v=5RqHjFfVw7Y.

6

matter, likely, the Circuit has approved limiting public access to judicial proceedings. See, e.g., Doe, 63 F.3d at 127, 130.

### B. The National Security and International Cooperation Interests

Badat's testimony in this case was made available by the voluntary cooperation of the British government with the United States Department of Justice pursuant to a Mutual Legal Assistance Treaty between the two countries. Foreign nationals residing abroad are beyond the subpoena power of American federal courts, and their testimony cannot therefore be secured by compulsory process. See, e.g., Relational LLC v. Hodges, 627 F.3d 668, 673 (7th Cir. 2010) ("[F]oreign nationals are beyond the court's subpoena power."); United States v. Drogoul, 1 F.3d 1546, 1553 (11th Cir. 1993) ("Because the witnesses are foreign nationals located outside the United States, they are beyond the subpoena power of the district court."); 28 U.S. § 1783 (providing U.S. district courts authority to subpoena person in foreign country only if said person is "a national or resident of the United States").

As described above, the British government has invested substantial resources in protecting this witness from physical violence and retaliation by al-Qaeda members and associates. The British police officials responsible for Badat's safety have informed the United States that the public release of Badat's current appearance would dramatically increase the risks posed to his physical safety in the United Kingdom. As the United Kingdom does not have the same type of Witness Security Program offered by the United States Marshals Service, it would be incorrect to assume that the same range of protective measures available to cooperating witnesses here is available there. Indeed, in a small country like the United Kingdom, which as a practical matter has fewer opportunities to relocate witnesses to remote places where they are unlikely to know anyone, a changed physical appearance is one of the best guarantors of safety available to witnesses seeking to keep their identities private.

The jeopardy to the relationship between the U.S. Department of Justice and its foreign partners that would result from the release of a video posing a threat to a foreign witness's safety would also have ramifications for American national security. The Department of Justice's ability to secure the testimony of foreign nationals, including convicted terrorists, in the criminal trials of members of international terrorist organizations is crucial to its ability to obtain just verdicts at those trials. In this case, the government was able,

7

by virtue of its strong cooperative relationship with the British authorities, to achieve the extraordinary result of securing the testimony of a foreign al-Qaeda member whose cooperation had previously been classified and never before made available in an American – or any – court. Such efforts would be impaired in the future should foreign witnesses' testimony in U.S. courts be viewed by our international partners as inevitably posing threats to those witnesses' safety.[4] Cf. United States v. Fields, 113 F.3d 313, 324 (2d Cir. 1997) (recognizing "strong" government interest in protecting identities of "informants who furnish information regarding violations of law" because such protection "improves the chances that such a person will continue providing information and encourages other potential informants to aid the government").

It again bears note that the only protections being sought in this case are those that typically accompany the testimony of witnesses in federal criminal trials, i.e., the ability to avoid having a photographic likeness of oneself while testifying released to the media. Releasing videotaped depositions therefore places deposition witnesses – typically foreign witnesses – in a materially different position than even domestic cooperating witnesses. In the case of a witness in the U.S. Marshals' Witness Security Program, for example, he or she would be brought into the courtroom via secure entrances, denying the media an opportunity to photograph him/her, and would testify outside the presence of cameras. The U.S. government's inability to protect foreign witnesses to the same degree it protects its own will erode its ability to secure the international cooperation necessary to the successful prosecution of terrorism cases.

### C. Protecting the Video-Recording Is Already A Narrowly Tailored Remedy

Finally, the government notes that the remedy it seeks here is more modest than alternative remedies potentially available under Second Circuit case law. For example, Second Circuit law authorizes a district court to seal the courtroom

---

[4] If Badat had testified in the United Kingdom, the release of photographic images of him could have been prohibited by court order pursuant to Section 46 of the U.K. Youth Justice and Criminal Evidence Act of 1999. The British government therefore expected, in agreeing to allow him to testify in the U.S., that the same minimal protections available to him in the U.K. would be available to him here.

8

entirely if necessary to protect physical safety. See, e.g., Doe, 63 F.3d 121, 127 & n.2 (2d Cir. 1995), and cases cited therein. Second Circuit law also contemplates the use of light disguise for the same purposes, at least where the disguise does not infringe on the Confrontation Clause rights of the defendant. See Morales v. Artuz, 281 F.3d 55 (2d Cir. 2002) (citing cases discussing the contours of the doctrine governing disguises). While the British authorities would have welcomed such protective measures, in an effort to keep the proceedings as open as possible and provide maximum respect for the defendant's and the public's constitutional rights, the government was able to assuage the British police concerns with the assurance that Badat's image would not be released to the public.

Had the government sought one of the protective remedies described above, the court would have been authorized to grant the request if, under the First Amendment balancing test, it had identified a compelling interest and proposed a narrowly tailored solution. See United States v. Alcantara, 396 F.3d 189, 191-92, 199 (2d Cir. 2005). Application of a higher common law right of access standard here would have the paradoxical effect of encouraging the government to seek protections during trial that would ultimately limit the defendant's and public's access to relevant information.

9

IV. Conclusion

While in most instances the public dissemination of a videotaped Rule 15 deposition will not invoke interests sufficiently compelling to overcome the presumption of access to judicial records, that is simply not the case where the worldwide release of the videotape would pose significant threats to the witness's safety, international relations, and national security. For the foregoing reasons, the government respectfully requests that the Court not order the release of the video-recording of the deposition to the media.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/ Marshall L. Miller
    Marshall L. Miller
    Chief, Criminal Division

    David Bitkower
    James P. Loonam
    Berit W. Berger
    Assistant U.S. Attorneys

cc: Defense Counsel
    Jonathan Dienst, NBC